[No. 13424. Department One. December 12, 1916.]

# W. R. BALLARD et al., Appellants, v. ALASKA THEATRE COMPANY, Respondent.[1]

FIXTURES—LANDLORD AND TENANT—TRADE FIXTURES. Under a fifteen-year lease of premises upon which the lessee agreed to erect a theater building to cost not less than a certain sum, and to pay a fixed rental for the term, the usual furnishings, which were not mentioned in the lease, such as removable electric fixtures, opera chairs, picture machines and screen, carpets and furnishings for the ladies' dressing room, of a perishable nature, are not fixtures.

SAME. A clause in such a lease requiring the lessee to yield up the premises in a "good tenantable condition" does not contemplate that the building should be furnished for any particular purpose, so as to make such furnishings fixtures.

SAME. The fact that the building was constructed for a particular purpose and specially to receive the very furnishings installed, which were suitable only for this particular building or type of building, does not make the furnishings fixtures.

SAME—LANDLORD AND TENANT—TRADE FIXTURES — INTENT — EVIDENCE. Whether fixtures become part of the freehold or are trade fixtures, removable by the tenant, depends upon the intent of the parties, to be inferred, when not determined by express agreement, from the nature of the article affixed, the relation and situation of the freehold after annexation, the manner and purpose of the annexation, considered in the light of the ordinary rules applicable to landlord and tenant.

SAME — ANNEXATION — PRESUMPTIONS. As between landlord and tenant, the presumption is that the tenant did not intend to enrich the freehold by annexing fixtures.

SAME—LANDLORD AND TENANT—TRADE FIXTURES — ANNEXATION— REMOVAL—EVIDENCE. Opera chairs and a vacuum cleaner, placed in a theater building by a tenant, and purchased under conditional sales

[1] Reported in 161 Pac. 478.

contracts, are not fixtures that become part of the freehold, in view of the presumption that they are trade fixtures.

SAME. The same is true of a pipe organ manufactured and installed by the tenant after the building was completed, although to remove it requires the tearing away of parts of partition walls that were taken out in order to receive it, where no material injury to the building would ensue; and the same is true of other fittings the removal of which would work no material injury to the building.

Appeal from a judgment of the superior court for King county, John Kelleher, Esq., judge *pro tempore*, entered December 20, 1915, in favor of the defendant, in an action for an injunction, tried to the court. Affirmed.

*Bogle, Graves, Merritt & Bogle*, for appellants.

*J. W. Albright* and *Peters & Powell*, for respondent.

FULLERTON, J.—The respondent, as the lessee of the appellants, erected a theater building upon a certain lot situated in the city of Seattle, of which the appellants are the owners. The building was erected pursuant to the terms of a written lease, which provided that the building should be of certain standard construction, should cost not less than $75,000, and should be wholly the property of the owners of the realty. The lease also provided that the premises should be quietly yielded up at the expiration of the lease in a good and tenantable condition in all respects, reasonable wear, damage by fire or unavoidable casualty excepted. The lease was for a term of fifteen years from and after February 1, 1914, with a renewal privilege of five years additional. The rent reserved was two thousand dollars per month.

The respondent completed the building in accordance with its agreement, fitted it up and operated as a moving picture theater until November 1, 1915, a period of some twenty-two months, when it found itself unable to continue the business longer. At that time it notified the appellants that it would quit and surrender the premises, and was proceeding to remove from the building certain furnishings which it conceived

to be trade fixtures and no part of the freehold, when the present action was begun to restrain it from so doing.

Of the articles over which the contest was waged in the court below, the court found to be trade fixtures and awarded to the respondent the pipe organ, the opera and opera box chairs, the electric sign and frames, certain of the electric fixtures used for lighting the building, the carpets, curtains and draperies, the sign frames, the umbrella lockers, the picture screen, the picture machines, the portable switchboard, the vacuum cleaner, the piano, and the draperies and furniture of the ladies' dressing room.

In the plans for the building, a space was allotted for the pipe organ by the architect in charge, and bids were invited for an instrument that could be accommodated in the space allotted. A bid of a manufacturer was accepted, but the instrument itself did not arrive until after the building had been completed and in use for some time. It came in a knocked-down condition, but it was found that, to get some of the larger pieces into the space provided, certain structural portions of the partition walls of the building had to be removed. There were two such removals, one to admit a portion of the organ proper, and another to admit the organ blower. The parts of the walls removed were replaced after the organ had been put together, and to remove it would again require the removal and replacing of these same parts of the wall.

The opera chairs were not manufactured specially for the building. After the completion of the building, the floors of the main seating room and balcony were marked off into aisles necessary to be established and maintained in virtue of the municipal ordinances, and the remaining spaces measured for the placement of the chairs. These spaces were of varying dimensions, and to properly fit chairs in them, different width of chairs were required. The chairs were selected with reference to spaces and with reference to the color scheme of the building, and the aisle standards were cast ac-

cording to a selected design. The municipal ordinances also require that all such chairs be securely fastened to the floor, and these were fastened by inserting expansion bolts into the concrete floor at proper places to fit into holes in the feet of the chairs; the chairs being fitted over the bolts and fastened with nuts in the usual manner. They can be removed by unscrewing the nuts and lifting the chairs from the bolts. New chairs of the same design from the same manufacturer can be fitted onto the bolts, but perhaps not those of any other manufacturer, as the particulars of the designs are not the same. To remove the chairs would leave the bolts protruding above the floors, but the evidence discloses that these can be removed without injury to the floor, the simplest way being to clip them off even with the concrete floor.

The opera box chairs are not fastened in any way to the building. They were selected, however, with reference to the size of the boxes, and were specially selected so as to comport with the general color scheme of the theater. No difficulty would be experienced in replacing them.

The electric sign and frame is on the front of the building and contains lights so arranged as to spell the words, "The Alaska Theater." It was specially designed for the building, and is supplied with electricity by wires leading from the source of supply through conduits passing through the building. The sign frame can be detached by releasing the wires and removing the screws by which the frame is attached to the building.

The electric light fixtures in question are those used for lighting the inside of the theater building. There are forty-seven of these in all, ten of which are curved to fit the columns on which they are placed, and were specially shaped for that purpose. They are not such fixtures as are usually found in stock. The other thirty-seven, as we understand the record, are the usual stock fixtures. None of them are built into the frame of the building, and all can be removed without injury

thereto, by merely loosening the fastenings by which they are held in place.

The carpets are tacked down to wooden strips embedded in the concrete floor, and were especially cut to fit the curves and sides of the aisles and floors. The draperies are hung on rings which slide on poles, the poles being fastened to the building with sockets and brackets screwed onto plugs inserted in the walls. The stage curtain does not roll up but parts in the center, and is operated by a motor which sets upon a cushion to which it is made fast with bolts. All are capable of being removed without injury to the building.

The sign frames are brass and copper frames placed in panels on the outside of the building, intended to hold advertising signs. They are held by ordinary fastenings, and are capable of being removed without injury to the building. The umbrella lockers are racks which stand on floor without fastenings.

The picture screen consists of a canvas stretched on a wooden frame, which is hung at the back of the stage on the wall. It is hung on hinges screwed to wooden ledges built into the wall. It is a stock article, and all that is necessary to remove it is to unscrew the hinges from the ledges.

The picture machines are of the Simplex design and rest upon tripods. The tripods were placed in position before the floor of the picture room was completed, and the feet thereof, together with the electric wires which lead to the machine, are imbedded in the floor. The machines are ordinarily portable, and these could be removed with only such damage to the floor as could be easily repaired.

The portable switchboard is in the orchestra pit and is movable for a distance of probably six feet, so made as to be available for either the organist or the pianist, and is for use in controlling the lights and the curtain motor. It can be detached by disconnecting the wires.

The vacuum cleaner is a stock machine, placed in the basement of the building. A concrete foundation was put in on

which was bolted a ten-plate for holding bolts, and the machine was bolted to the ten-plate. Connections were made with the suction pipes leading to the various rooms, and with a discharge pipe leading to a sewer. To remove it requires disconnecting the pipes and releasing it from the ten-plate to which it is bolted. It was not specially designed for the building, although its manufacturer was the only one out of a number of different manufacturers of vacuum cleaners who would install a sewer connection and guarantee its successful operation.

The piano is a standard instrument, and the office furniture and the furniture for the ladies' dressing room with the other furnishings thereon are articles in common use, such as are found among dealers therein generally.

The appellants, while admitting that, between landlord and tenant, as that relation is ordinarily understood, many of the articles enumerated would be property of the tenant and removable by him at the termination of the tenancy, make the contention that the ordinary rules are not applicable to the situation as here disclosed. It points out that the defendant corporation was organized for the sole and only purpose of taking over the lease to the real property, erecting a building thereon, and conducting a theater therein for a fixed period of time; that it was not a case of a theater company doing business first in one building and then in another and removing its trade fixtures from place to place, but was a case of a company organizing for a particular purpose at a particular place, and procuring fixtures in some instances specially, and in all instances generally, designed for the particular building, which was in itself planned in its inception to receive fixtures of this character and none other. It is further pointed out, also, that the tenant is insolvent and does not intend to engage in the theater business elsewhere, and that the controversy is in reality a contest between the appellants and the creditors of the tenant. From this it is argued that it was the intention of the parties to complete

and equip a theater building suitable for the purpose for
which it was intended to be used, and that the claim made
now that the articles of furniture placed therein are chattels
or trade fixtures subject to be taken by the outgoing tenant
is directly antagonistic to this manifest intention.

But we cannot think the tenancy differs in this regard from
an ordinary tenancy.  The lessee, it will be remembered, con-
tracted to erect on the leased premises a theater building to
cost not less than a certain fixed sum of money, and to pay
another fixed sum as rental for the property for a fixed period
of time.  There was no agreement that it should be furnished
in any particular manner.  Indeed, while it was undoubtedly
contemplated by the parties to the lease that the building
was to be furnished as a moving picture theater and that such
a business would be conducted therein, the terms of the lease
would have been complied with by the construction of the
building and the payment of the rent, without furnishing it
in any manner or putting it to any particular use.  Again,
many of the enumerated articles are, from their very nature,
fragile and shortlived.  It would be strange indeed, if the
electric sign, the electric fixtures, the opera chairs, the pic-
ture machine, the picture screen, the carpets, or the furnish-
ings for the ladies' dressing room, would have been in a
usable condition after fifteen years of service.  Clearly these
articles were so far personal property that they could be
removed and replaced by the tenant as the necessities of the
case or the demands of the business required, without the con-
sent, let or hindrance of the landlord.  The clause in the
lease requiring the tenant to quietly yield up the premises at
the termination of the lease or sooner termination of the
tenancy in a "good and tenantable condition," did not con-
template that the building should then be furnished for any
particular purpose.  This is a customary clause in all leases,
and contemplates the return of the land with its appur-
tenances that pertain to the realty, not the personal property

or trade fixtures which the tenant introduces for his own special purpose.

Stress is laid on the fact that this building was constructed for a particular purpose, that it was constructed specially to receive the very fixtures the tenant installed in it, and that these were suitable only for this particular building or type of building. But this is true of many buildings other than those built specially for a moving picture business. For example, the lessee of a dwelling house for a term of years would want the furniture and fixtures he placed therein to correspond with the general contour and color scheme of the building; so the lessee of a building to be used as place for the sale of goods, wares and merchandise; and the lessee of a building to be used for manufacturing purposes, would doubtless be controlled to some extent by the form and style of the building when selecting machinery for his purposes; yet it would not be contended in any of such instances that the fact would be a controlling element in determining whether the furnishings or fixtures become a part of the realty. We cannot conclude, therefore, that the rules governing the determination of the question are different in this case from those ordinarily pertaining to landlord and tenant.

It remains, then, to inquire whether the properties in question are fixtures in the sense that they form a part of the realty, or are trade fixtures capable of being removed by the tenant, considering the question in the light of the ordinary rules applicable to landlord and tenant.

In determining whether a chattel which has been annexed to the freehold is a trade fixture or a part of the realty, the cardinal inquiry is into the intent of party making the annexation. Often there is difficulty in determining the intent, but, whatever may be the legal relation of the parties between whom the controversy is waged, when the intent is discovered it is generally controlling. The intent is not to be gathered from testimony of the actual state of the mind of the party making the annexation (*Washington Nat. Bank v. Smith*, 15

Wash. 160, 45 Pac. 736) ; but is to be inferred, when not de-
termined by an express agreement, from the nature of the ar-
ticle affixed, the relation and situation to the freehold of the
party making the annexation, the manner of the annexation,
and the purpose for which it is made.   It is conclusive, of
course, that the chattel annexed is a fixture when it cannot be
removed without a material injury to the freehold, as, for
example, where it is essential to the support of some part
of a permanent structure.   *Lawton Pressed Brick & Tile Co.
v. Ross-Kellar Triple Pressure Brick Mach. Co.*, 33 Okl. 59,
124 Pac. 43, 49 L. R. A. (N. S.) 395.   But before this rule
will be allowed to govern, it must be shown that the removal
will result in a material injury; injuries that are inconse-
quential, or injuries that can be made whole do not affect the
principle.

Again, a different rule obtains for determining the intent
when the question arises between landlord and tenant, or
licensor and licensee, than obtains when it arises between
grantor and grantee, mortgagor and mortgagee, or heir and
executor.   When the annexation is made by a tenant or li-
censor the presumption is that he did not intend to enrich the
freehold, but intended to reserve title to the chattel annexed
in himself, while from an annexation by the owner of the
property, the presumption is the other way.   *Chase v. Ta-
coma Box Co.*, 11 Wash. 377, 39 Pac. 639; *Dunsmuir v. Port
Angeles Gas, W., El. L. & P. Co.*, 30 Wash. 586, 71 Pac. 9;
*Lynn v. Waldron*, 38 Wash. 82, 80 Pac. 292; *Welsh v. Mc-
Donald*, 64 Wash. 108, 116 Pac. 589; *Cutler v. Keller*, 88
Wash. 334, 153 Pac. 15.

It therefore often happens that the same character of
article annexed to the realty in the same way will be held
to be a trade fixture and removable when annexed by a ten-
ant, but real property and not removable when annexed by
the owner of the property.   A good illustration is found
among our own cases.   In *Welsh v. McDonald, supra*, the
controversy was between landlord and tenant.   It was held

that mill buildings, camp buildings, barns, and outhouses, erected by a tenant on leased land for the purpose of conducting a sawmill business, were removable at the will of the tenant at any time before the expiration of the lease. In the course of the opinion the court said:

"The testimony shows that all these buildings were erected exclusively for the benefit of the milling business which was carried on by the lessors. Many of the small houses were built by the laborers employed by the mill owners, and the laborers were charged by the mill owners for the lumber which was used in the construction of said small houses.

" 'That articles which are annexed by the tenant for purposes of trade, known as "trade fixtures," are removable by him as against the landlord, has been recognized from an early period in the development of the law of fixtures, the theory being that it is public utility that the tenant should be enabled to improve the property for the purpose of carrying on trade, without thereby forfeiting his improvements.' 1 Tiffany, Modern Law of Real Property, § 240.

" 'The strict rule of the early common law under which chattels which had been physically annexed to the freehold became the absolute property of the landlord has been gradually and greatly relaxed in favor of tenants. The first exception to this rule was made in the case of trade fixtures so called such as were placed upon the premises by the tenant during the term for the purpose of carrying on trade, commerce, or manufacture. It is now a general rule that whatsoever is affixed, as a trade fixture, to the land or to any building which is on the land during the term whether made of wood, stone, iron or other material, is removable by the tenant at the end of the term. And it is difficult to conceive of any so-called fixture, however solid, permanent and closely attached to the realty which is placed there for the sole purpose of trade which may not be removed by the tenant at the end of his term.' 2 Underhill, Landlord & Tenant, § 736.

"Under this modern rule it has been uniformly held that a building erected upon leased land for the purpose of carrying on the business of the lessee was removable at the will of the lessee, provided it was removed during the term of the lease."

In the case of *Cutler v. Keller, supra,* the controversy was between lien claimants on the one side and mortgagees on the other. The owner had erected a building on the property to which the several liens attached, intending to use the building as a moving picture studio. The building was set upon posts and was capable of being removed without injury to the freehold. It was held that the building was a part of the realty, the court saying:

"As a general rule, structures of a permanent character erected on land by the owner in fee simple are presumed to be built for the purpose of improving the land and to become a part of the realty, in the absence of evidence of a contemporaneous contrary intention. . . .

"When buildings are placed by the absolute owner of land on which they rest, their quality of removability without injury to the freehold is not usually a factor of controlling importance as between mortgagor and mortgagee, *Rowland v. Sworts,* 17 N. Y. Supp. 399, though it may be as between landlord and tenant or licensor and licensee.

" 'Fully as much importance is attached to the relation of the party making the annexation, to the land and the permanency and habitual character of the annexation, as is paid to the manner or form of the fastening. When the absolute owner of the land, for the better use of his land, erects property upon, or attaches it to the freehold, it will go to his heir, or pass by deed, to his grantee, and the same general rule applies between mortgagor and mortgagee, but as between landlord and tenant and licensor and licensee, this rule is relaxed, with a view to the encouragement of mechanical and agricultural pursuits.' Tiedeman, Real Property (3d ed.), p. 23, § 17."

In the light of these principles, we are clear that the trial court did not err in its judgment. Much of the property would be regarded as personalty no matter by whom installed, since it is in no way attached in such a manner as to hold it in place while in use, but which must be constantly removed for renovation or repair. In this jurisdiction the opera chairs certainly, and the vacuum cleaner probably, would, under our earlier decisions, be regarded as realty and

would pass by a deed from the owner to his grantee, but since they were purchased and put in place by the tenant, most of them under conditional sales contracts, we cannot conclude, under the presumption that prevails in such cases, that they became a part of the realty. All can be removed without material injury to the structure or to themselves.

The pipe organ is not in any way a part of the building. It was manufactured and installed, as we have said, after the building was completed. The right to remove it is denied because to do so requires tearing away certain parts of the partition walls. But all of the evidence is to the effect that these parts were taken out on the installation of the organ and subsequently repaired, and that the organ can be removed by reopening the walls at the same places. The fact that they were once opened and replaced would not perhaps justify a second opening if the building should be materially injured by the act. But the evidence discloses that no material injury to the building will ensue from such an opening, and the fact that it was once made without objection by the owners of the fee is forceful evidence of the immateriality of the injury. The removal of the other articles which are attached to the building will not, as is shown from our review of their nature and the manner in which they are attached, work material injury to the building. Their removal will require some repairing to make the building again a completed whole. The trial court met this by requiring that the tenant give a bond in the penal sum of $1,000, conditioned that it will repair and make good any and all damage which shall be caused the building by the removal of the property. It is not questioned that this sum is sufficient to meet the incidental damage the removal of the property will cause.

The judgment is affirmed.

Morris, C. J., Mount, Chadwick, and Ellis, JJ., concur.