[No. 28069. *En Banc.* June 14, 1941.]

N. C. STRONG, *as Trustee, Appellant,* v. SUNSET COPPER COMPANY *et al., Defendants,* N. DOTSON *et al., Respondents.*[1]

[1]Reported in 114 P. (2d) 526.

215

*Bogle, Bogle & Gates* and *Warren Brown, Jr.,* for appellant.

*Houghton, Cluck & Coughlin* and *Emil P. Schubat,* for respondents.

STEINERT, J.—This action was brought to foreclose a real estate and chattel mortgage executed by defendant Sunset Copper Company as security for a bond issue. A number of the defendants, including Sunset Copper Company, defaulted, and certain other defendants, employees whose labor liens on the mortgaged property had been foreclosed in a former suit, answered and pleaded affirmatively that plaintiff's action was barred by the statute of limitations. The cause was tried to the court, without a jury, and, after the court had orally announced its decision to the effect that the action was barred by the statute so far as the lien claimants were concerned, plaintiff moved for judgment notwithstanding the oral decision. The motion was denied. Plaintiff further moved, in the alternative, for an order reopening the case for further evidence, or, for an order granting a new trial. The alternative motion was supported by affidavits claiming newly discovered evidence. That motion was also denied, on the ground of lack of due diligence on the part of plaintiff. The court thereupon entered a decree foreclosing plaintiff's mortgage, but adjudging the lien thereof to be subordinate to the rights of the labor lien claimants. From the portions of the decree adverse to him, plaintiff appealed.

On April 8, 1921, defendant Sunset Copper Company, being the owner of certain mining property in Snohomish county, executed and delivered to Central Securities Company, a corporation, as trustee, a mortgage and trust deed covering that property. The purpose of the mortgage and deed of trust was to secure the payment of a two hundred thousand dollar bond issue evidenced by two hundred bonds, each of the par value of one thousand dollars, to be issued by Sunset Copper Company. The maturity date of the bonds

was April 1, 1931, and interest on the bonds was payable on April 1 and October 1 of each year.

On March 28, 1927, the trustee resigned, and the record does not disclose whether or not any successor was appointed prior to July 28, 1938. On the latter date, appellant, N. C. Strong, one of the bondholders, was named trustee to fill the vacancy.

Of the two hundred bonds provided for by the trust deed, one hundred and twenty-one, having an aggregate par value of one hundred and twenty-one thousand dollars, were issued. Of these, ninety-one were sold to investors, and thirty were delivered to Diamond Ice Co., a corporation, to be held by it as collateral for a note for thirty thousand dollars which Sunset Copper Company had given to the ice company some time prior to 1931.

On, or shortly before, April 1, 1931, the maturity date of the bonds, Sunset Copper Company, through its president, requested an extension of time of payment thereof, and during that year fifteen of the bondholders, including appellant, representing a total of fifty-five thousand dollars secured by the bonds, respectively signed agreements in which, after certain recitals, appeared the following provisions:

" . . . the undersigned [bondholder] hereby extends the time of the payment of said bonds for a period of two years from and after April 1, 1931, provided that the interest each six months shall be promptly paid. A failure to pay interest each six months as the same accrues will render this extension null and void."

Diamond Ice Co. was not among the signers of the extension agreements. It is also to be noted that Sunset Copper Company, the obligor upon the bonds, did not sign any of those instruments.

No payment of either principal or interest on the bonds was made either during, or after, the period

covered by the above-mentioned extension agreements.

On April 29, 1936, Sunset Copper Company, through its president, made another request for extension of payment, for a period ending May 1, 1937. In response to that request, each of the holders of the outstanding bonds, with the exception of Diamond Ice Co., signed an agreement in which, after certain recitals, appeared the following provisions:

"In consideration of the sum of One Dollar and other valuable consideration in hand paid, the receipt whereof is hereby acknowledged, the undersigned [bondholder] hereby extends the time of the payment of said bonds, both as to principal and as to interest now accrued and to accrue, for a period ending May 1, 1937. This extension is given for the purpose of enabling the company to finance itself and protect its properties."

All of those agreements, except two, were dated either April or May, 1936; one was dated June 1, 1936; and one was undated, except for the year 1936. It is again to be noted that Sunset Copper Company did not sign any of those instruments.

The bonds were not paid on the extended maturity date, nor at any other time.

On June 19, 1938, respondents, former employees of Sunset Copper Company, obtained a judgment and decree in another action, previously brought by them in the superior court of Snohomish county, foreclosing their labor liens on Sunset Copper Company's real estate and mining claims, together with the improvements and machinery thereon, all of which property was covered by the trust deed and mortgage involved in the instant case. After the decree in the suit brought by the labor lien claimants had been entered, but before a sale in pursuance thereof was made, appellant instituted the present action, on August 18, 1938, naming as defendants Sunset Copper Company, respondent

labor lien claimants, and certain other parties who have not appeared upon this appeal.

The principal question to be determined here is whether or not appellant's action is barred by the statute of limitations. According to the provisions of Rem. Rev. Stat., §§ 155, 157 [P. C. §§ 8160, 8162], an action upon a contract in writing can be commenced only within six years after the cause of action has accrued. Respondents' contention is that appellant's action is barred because it was not brought within six years after April 1, 1931, the original maturity date of the bonds. It will be recalled that the action was not begun until August 18, 1938. Appellant, on the other hand, contends that the extension agreements, made in 1931 and 1936, respectively, were valid contracts, the legal effect of which was to fix new maturity dates of the bonds, from which latter dates, it is claimed, the statutory period is to be computed.

With respect to the 1931 extension agreements, respondents, in turn, contend, first, that, since Sunset Copper Company failed to pay interest as required by those agreements, the extension became "null and void" by the very terms of the instruments, and therefore had no operative effect upon the original maturity date of the bonds. We will assume, *arguendo*, that respondents' contention in that respect is correct, and we therefore eliminate the 1931 extension from further consideration.

With respect to the 1936 extension agreements, respondents contend that they are invalid because of the requirements of Rem. Rev. Stat., § 176 [P. C. § 8183], which statute will be referred to again and discussed later in this opinion.

As stated above, the extension agreements executed in 1936 were at the request of Sunset Copper Company, the obligor upon the bonds. In granting the

extension, the bondholders, each of whom signed one of the agreements, expressly agreed to extend the time of payment, and thereby obligated himself not to sue upon the bonds prior to the expiration of the extension period. By requesting and accepting the extension, Sunset Copper Company, in turn, not only waived the right to pay the obligation at once, and thus terminate further accrual of interest, but also impliedly agreed to pay the interest on the bonds, at the rate therein stated, during the period of the extension, and to pay the principal on the new maturity date. That such mutual agreements, even though partly implied, constitute a valid, binding contract between the parties has been definitely settled in this state.

In the case of *Nelson v. Flagg,* 18 Wash. 39, 50 Pac. 571, the makers and the holder of a promissory note dated November 21, 1893, entered into an arrangement whereby an extension of time of payment of the note for a period of one year was granted. The contract of extension was evidenced by a memorandum endorsed on the back of the note as follows:

" 'November 21, 1894. Extended one year from date at the request of makers, A. E. Flagg and Lola J. Flagg. (Signed.) Ole Nelson.' "

The makers did not sign the extension memorandum. In holding the contract valid and binding, this court said:

"We think that there are all the elements of a valid contract to be gathered from the indorsement under consideration. The effect of the indorsement in this case, in the light of the finding that it was at the maker's request and with his consent, was to postpone the time of payment for one year. The consideration flowing to the holder was the implied promise of the maker to pay interest during the full period of the extension at the rate expressed in the instrument; and the promise of the holder to forbear suit for a definite period constituted a good consideration for the agree-

ment upon the part of the maker to pay interest for such full period. Here are all the elements of a valid contract, and upon principle we are unable to see why such an agreement should not be sustained by the courts."

The case of *Stankey v. Godwin*, 158 Wash. 494, 291 Pac. 725, after quoting, as above, from the *Nelson* case, relies upon it and arrives at the same conclusion. In 1 Williston, Contracts (Williston & Thompson, Rev. ed., 1937), 425, § 122, the general rule is stated as follows:

"When a debtor and creditor agree that an interest-bearing debt shall be extended for a fixed time, the promise of each is of something detrimental, as the creditor promises to forbear the collection of his claim, and the debtor gives up his power to stop the accrual of further interest by the payment of the principal at maturity. Accordingly, such agreements are generally upheld." (Citing a list of cases including *Stankey v. Godwin, supra.*)

We have, then, under the foregoing authorities, a valid, binding contract, in this case, whereby the maturity of the bonds was extended to May 1, 1937. Upon that basis, the statute of limitations has not operated to bar appellant's action, because the statute runs only from the date when the cause of action accrues, and, in this instance, the cause of action did not accrue until the period of extension had expired.

Respondents, however, contend that the extension agreements were ineffectual because of the requirements of Rem. Rev. Stat., § 176, which statute provides:

"No *acknowledgment or promise* shall be sufficient evidence of a new or continuing contract whereby to take the case out of the operation of this chapter [on limitation of actions], unless the same is contained in some writing signed by the party to be charged thereby; . . ." (Italics ours.)

In this case, of course, the party to be charged was Sunset Copper Company, the obligor upon the bonds. As already stated, the obligor did not sign the extension agreements; nor was there introduced at the trial any other writing, signed by that company, containing any acknowledgment or promise with reference to the bonds. It may therefore be conceded that, if Rem. Rev. Stat., § 176, is applicable to the instant situation, appellant's action must be held to have been barred by the statute of limitations.

It will be observed that Rem. Rev. Stat., § 176, above quoted, relates to an "acknowledgment" or "promise," each of which quoted terms, as we construe them, has reference to a *unilateral* act or statement. It will further be noted that the statute states simply that such unilateral action, that is, a mere "acknowledgment" or "promise" on the part of the obligor, is not, of itself, *sufficient evidence* of a *contract* unless such acknowledgment or promise be in writing. In the case at bar, however, we have more than a mere acknowledgment or promise on the part of the obligor; we have a valid, binding contract, which, under the rule laid down in the *Nelson* and *Stankey* cases, *supra*, is supported by *contemporaneous consideration*. Stating the proposition somewhat differently, we have not merely a single element, such as an acknowledgment or unilateral promise which, of itself, is insufficient *evidence* of a contract; we have, rather, all the elements necessary to constitute a valid, mutually binding contract between the parties to be bound. In that situation, Rem. Rev. Stat., § 176, does not apply.

Our statute, like those of many other states in this country, is based upon the so-called Lord Tenterden's Act (9 George IV, c. 14, § 1). Discussing the effect of such statutes, Professor Williston, in his work on contracts, says categorically:

"A new promise which is supported by contemporaneous consideration is not within the terms of such statutes [statutes based on Lord Tenterden's Act] . . . " 1 Williston Contracts (Williston & Thompson, Rev. ed., 1937), 547, § 164."

The following cases, representing the weight of authority in this country, support that statement: *Christian Women's Board of Missions v. Clark,* 140 Ark. 262, 215 S. W. 631; *Weideman v. Peterson's Estate,* 129 Neb. 74, 261 N. W. 150; *Devine v. Murphy,* 168 Mass. 249, 46 N. E. 1066; *Schwartz v. Edmunds,* 20 Cal. App. (2d) 530, 67 P. (2d) 351; *In re Gould,* 257 App. Div. 109, 12 N. Y. Supp. (2d) 664 (Reversed on another point in 282 N. Y. 132, 25 N. E. (2d) 877); *Murtha v. Donohoo,* 149 Wis. 481, 134 N. W. 406, 136 N. W. 158, 41 L. R. A. (N. S.) 246; *Zuehlke v. Irvin,* 32 S. W. (2d) (Tex. Civ. App.) 868; *Heisch v. Adams,* 81 Tex. 94, 16 S. W. 790, clarified in *Wells v. Moor,* 42 Tex. Civ. App. 47, 93 S. W. 220; but see, contra, *Tolleson v. McAlister,* 33 S. W. (2d) (Tex. Civ. App.) 573. See, also, as supporting the rule, *Burnett v. Turner,* 105 Ark. 290, 151 S. W. 249, and *Graham v. Stanton,* 177 Mass. 321, 58 N. E. 1023.

The theory underlying the reasoning and holding of the authorities above cited is aptly stated in the following quotation from one of those cases:

"The distinction between the present case and those within the purview of our statute of limitations is that in the instant case the effect of the oral agreement alleged herein is that the latter is a *separate, distinct and independent contract* into which the obligations of the original undertaking become only an element of its consideration." (Italics ours.) *Weideman v. Peterson's Estate, supra.*

We recognize the fact that, upon the point under discussion, there is some authority to the contrary. Respondents cite two cases which undoubtedly sup-

port their contention: *Perry v. Ellis,* 62 Miss. 711, and *In re Sleezer's Estate,* 209 Iowa 56, 227 N. W. 644. See, also, *Tolleson v. McAlister,* 33 S. W. (2d) (Tex. Civ. App.) 573. We prefer, however, to follow the weight of authority, as indicated by the cases previously cited.

As stated by respondents' counsel, there is no case from this jurisdiction which is precisely in point on its facts. There are, however, three cases, decided by this court, which present situations analogous to the one here under consideration, and which should therefore be considered.

In *Diettrich Bros., Inc. v. Anderson,* 183 Wash. 574, 48 P. (2d) 921, the defendant interposed Rem. Rev. Stat., § 176, as a bar to a suit upon an account stated, and it was held that

" 'The statement of an account creates an independent indebtedness, and the Statute of Limitations runs from the date when it is stated, without regard to the dates when the several items entering into the account became due.' "

In *Fleishbein v. Thorne,* 193 Wash. 65, 74 P. (2d) 880, a mortgage, which had become outlawed but which constituted a cloud upon the title to property, had been released by the plaintiff in consideration of an express oral agreement by the mortgagor to execute a second mortgage as a renewal of the former one. The mortgagor died without fulfilling her agreement. In an action brought by the plaintiff against the executor of the deceased mortgagor's estate to establish his second mortgage, the defendant resisted upon the grounds, among others, that the action was upon the original mortgage contract, which was barred by the six-year statute of limitations, and that, under the provisions of Rem. Rev. Stat., § 176, the promise of the mortgagor to execute a second mortgage was unen-

forceable because it was not in writing. This court allowed the plaintiff recovery, upon the theory that the action constituted a bill in equity to enforce performance of a promise by one to execute a mortgage in favor of another who had fully performed his part of the contract, although the contract was not in writing.

While neither of the two cases just referred to is exactly in point, they nevertheless lend support to the conclusion at which we have arrived herein.

In an earlier case, however, this court used certain specific language which appears to be contrary to our present holding. In *Zuhn v. Horst,* 100 Wash. 359, 170 Pac. 1033, suit was brought against the estate of a deceased person to recover for services rendered to that person during his lifetime. The action was based upon an oral promise made by the decedent, in 1898, to provide the plaintiff with a home and support for life, and upon a later oral promise made by the decedent, in 1905, to execute a will naming the plaintiff as beneficiary and heir. Upon the trial, the plaintiff changed the basis of her action and offered evidence of a third, and more recent, oral promise made by the decedent, a promise to execute a will naming the plaintiff as his sole beneficiary. The defendant administrator challenged the sufficiency of the evidence, and interposed the bars of the statutes of frauds and of limitations. The trial resulted in a verdict for the plaintiff. Upon appeal, the judgment was reversed. The first, and a sufficient, ground for reversal was that no claim based on the third promise, upon which the verdict and judgment rested, had ever been presented to the administrator. The opinion went further, however, and held that, under the provisions of Rem. Code (now Rem. Rev. Stat.), § 176, the essential element of the contract sought to be established by proof of the third promise

was that such promise be in writing. Neither discussion nor citation of authority was offered in support of that particular statement. While that portion of the opinion might be harmonized with our holding herein upon the theory that in the *Zuhn* case there was *no contemporaneous consideration* for the promise, nevertheless the fact remains that the categorical statement made in that opinion, to the effect that such promise must be in writing, is inconsistent with our present view. For the reasons already given, that statement in the *Zuhn* case will not be considered as a correct statement of the law in a situation such as we have here.

We therefore hold, upon the first question presented on appeal, that appellant's cause of action, in so far as bondholders who signed the extension agreements of 1936 are concerned, is not barred by the statute of limitations.

■ Respondents next contend that "even if all of the bonds·were not outlawed, certain of them would be barred under any possible view of the facts." The bonds thus referred to are represented by three separate groups of ownership. The first group consists of the bonds held by Diamond Ice Co. As stated hereinabove, Diamond Ice Co. did not sign any extension agreement, nor, so far as the record discloses, did it in any manner assent to any extension of the maturity of the bonds. When requested to sign such an agreement in 1936, its assistant treasurer concluded to let the matter "stand as is on account of action required by [the ice company's] Board of Directors which is somewhat complicated." The statute of limitations was therefore not tolled with respect to the bonds held by the ice company.

■ In connection with this phase of the case, we will consider appellant's assignment of error based

upon the refusal of the trial court to reopen the case to permit the introduction of further evidence. After the court had announced its decision on the merits, appellant filed a motion to reopen, on the ground of newly discovered evidence. That evidence consisted of certain letters written to the bondholders by Sunset Copper Company on September 27, 1933, and April 29, 1936, respectively, in which letters, it is claimed, the company acknowledged its indebtedness. We will assume that those letters did contain such an acknowledgment, and that they therefore would have been sufficient to toll the statute of limitations as to all the bonds, including, of course, those held by Diamond Ice Co.

The affidavit in support of the motion alleged that appellant's counsel knew nothing about those letters until shortly before the motion to reopen was filed, and we accept that allegation as true. It is undisputed, however, that appellant, himself, as a bondholder, received copies of the letters, and it is a fact that, in response to the letter of April 29, 1936, he executed a written extension agreement, thereby binding himself as an individual bondholder. Having knowledge of those communications, it was the duty of appellant, who was acting as trustee for all the bondholders, to advise his counsel of that fact, and his failure to do so was, as the trial court stated, a failure by him to exercise due diligence.

Motions for new trial or for reopening the case, upon the ground of newly discovered evidence, are addressed to the sound discretion of the trial court, and the exercise of that discretion will not be disturbed except for manifest abuse. *Smith v. Kneisley,* 175 Wash. 29, 26 P. (2d) 387; *McCall v. Smith,* 184 Wash. 615, 52 P. (2d) 338; *Nelson v. West Coast Dairy Co.,* 5 Wn. (2d) 284, 105 P. (2d) 76. We find no abuse of discretion in

this instance. We hold, therefore, that the action of the trial court in denying the motion to reopen the case must be sustained. This holding, of course, affects only the bonds of Diamond Ice Co.

The second group of bonds against which respondents level their attack comprises those held by the E. S. McCord Estate. With respect to those bonds, the extension agreement was signed by the executor of that estate. Respondents' contention is that the evidence discloses that the bonds did not belong to the estate, but were actually held by another party as collateral for a note. The record does not support that contention. The very witness upon whose testimony respondents rely, in this connection, testified positively that those bonds were "held by the estate." Respondents' contention as to the second group of bonds therefore cannot be sustained.

The third group of bonds to which respondents direct attention comprises those held by four individuals, including appellant in his individual capacity. The basis of respondents' contention, in this connection, is that the extension agreements relative to those specific bonds provided for a maturity date of May 1, 1927, rather than the intended maturity date of May 1, 1937. Were there the slightest question in this case as to what the intended date was, a difficult situation might have been presented. In the instant case, however, there is no such question, under the evidence before us, and the discrepancy, which was merely a typographical error, will accordingly be ignored. Consequently, respondents' contention with respect to the third group of bonds must also fail.

The final question to be disposed of is that of whether certain items of equipment covered by the mortgage are chattels or fixtures. The necessity of deciding that question arises from the fact that Rem.

Rev. Stat., § 3782 [P. C. § 9761], provides that a chattel mortgage which has been filed

" . . . shall cease to be notice, as against creditors of the mortgagors . . . after the expiration of the time such mortgage becomes due, unless before the expiration of two years after the time such mortgage becomes due, the mortgagee . . . shall make and file as aforesaid an affidavit setting forth the amount due upon the mortgage, . . . "

It is undisputed that no such affidavit was filed by the chattel mortgagee, who was the trustee under the mortgage, and, accordingly, respondents, as creditors, have priority as to any *chattels* involved.

In the judgment and decree entered by the trial court, certain designated articles were held to be chattels. Respondents now contend that certain additional supplies and equipment should also be classified as chattels.

With respect to dishes, blankets, and sheets, shown by the evidence to be a part of the existing equipment, respondents' contention must, for obvious reasons, be sustained.

As to beds located in the bunkhouse, there is nothing in the record to indicate whether or not they were in any manner attached to the realty, and, the burden of proof in that respect having been on appellant, respondents' contention as to those items will likewise be upheld.

In all other respects, the trial court's determination of the nature of the equipment will stand. Practically all of the equipment which is the subject of dispute was bolted to specially prepared concrete foundations. While it is true, as respondents point out, that most of that equipment was of a stock nature, and could be removed by the mere unscrewing of foundation bolts, those two facts are not determinative of the particular

issue. The evidence amply discloses that the equipment in question was intended to constitute permanent improvements, and, accordingly, they constitute a part of the realty. They are fixtures, not chattels. They fall within the rule announced in the following language from one of our earlier decisions:

"In determining whether a chattel annexed to the freehold is a trade fixture or a part of the realty the principal inquiry is into the intent of the party making the annexation. This may sometimes be difficult, but, whatever may be the legal relation of the parties waging the controversy, where the intent is discovered it is generally controlling. *Ballard v. Alaska Theatre Co.,* 93 Wash. 655, 161 Pac. 478. In the case just cited it was said:

" 'A different rule obtains for determining the intent when the question arises between landlord and tenant, or licensor and licensee, than obtains when it arises between grantor and grantee, mortgagor and mortgagee, or heir and executor. When the annexation is made by a tenant or licensor the presumption is that he did not intend to enrich the freehold, but intended to reserve title to the chattel annexed in himself, while from an annexation by the owner of the property, the presumption is the other way. [Citations.]'

"In the present case, *the evidence shows that the property in question was attached to the real estate as firmly as it appears to have been reasonably possible to attach it, and, highly important, it was so attached by the owner himself.* The character of the property to which the annexation was made indicates the intention, since the things annexed were in use and to be used in the actual operation of the mines. The lands were patented mining claims. They were beyond the stage of prospecting and were ready for the work of production, which could not be accomplished without these annexations that were installed as a part and parcel of mining real estate. The presumption must be indulged in that they were attached by the owner with the intention to enrich the freehold." (Italics ours.) *Reeder v. Hudson Consolidated Mines Co.,* 118 Wash. 505, 203 Pac. 951.

See, also, *Hall v. Dare*, 142 Wash. 222, 252 Pac. 926, 50 A. L. R. 635; *Nearhoff v. Rucker*, 156 Wash. 621, 287 Pac. 658; *Reinoehl v. Vervaeke*, 196 Wash. 348, 82 P. (2d) 861.

The judgment is reversed, with direction to the trial court to enter judgment and decree in accordance with the views expressed herein.

ALL CONCUR.

