# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

APL LIMITED; AMERICAN
PRESIDENT LINES, LTD.; and EAGLE
MARINE SERVICES, LTD.,

        Appellants,

        v.

WASHINGTON STATE DEPARTMENT
OF REVENUE,

        Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 70469-9-I

DIVISION ONE

UNPUBLISHED

FILED: March 31, 2014

COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED
2014 MAR 31 AM 10: 46

Cox, J. — For the purposes of taxation, real property includes "land itself . . . and all buildings, structures or improvements or other *fixtures* of whatsoever kind thereon . . . ."[1] At issue in this retail sales tax refund action by APL Limited, American President Lines Ltd., and Eagle Marine Services Ltd. (collectively APL) is whether five 800-ton cranes leased by APL from the Port of Seattle constitute

---

[1] RCW 84.04.090 (emphasis added); see also WAC 458-12-010(3) (emphasis added) ("'Real property' includes . . . [a]ny *fixture* permanently affixed to and intended to be annexed to land or permanently affixed to and intended to be a component of a building, structure, or improvement on land, including machinery and equipment which become *fixtures*.").

personalty, which is subject to retail sales tax, or fixtures, which is not.[2] Because this record fails to show one of the three essential elements to prove a fixture— the Port's intent— we affirm the trial court's judgment denying a refund of taxes that APL paid.

This is the second time this case is before this court on appeal.[3] In the prior appeal, we reversed and remanded for further proceedings.[4] A bench trial followed in which the court denied the refund sought by APL.

The historical facts are largely undisputed. APL entered into a long-term lease with the Port in 1985 for use of a Port-owned facility known as Terminal 5 and for use of Port-owned container cranes.

Four of these cranes were installed at Terminal 5 in 1986. The fifth was installed about a year later. All five cranes (the "T5 Cranes") have remained at Terminal 5. The cranes weigh more than 800 tons and stand close to 200 feet tall. They are powered by a dedicated high voltage electrical substation and are connected to the substation by an electrical cable. The cranes operate on wheels that are positioned on 100-foot gauge rails connected to the terminal. They are held on the rails by gravity and move along the rails as part of their normal operation. The rails extend 2,900 feet from one end of the terminal to the other.

---

[2] See RCW 82.04.050(4)(a) ( "'Retail sale' includes the renting or leasing of tangible personal property to consumers.").

[3] APL Ltd., Am. President Lines, Ltd., & Eagle Marine Servs., Ltd. v. Dep't of Revenue, noted at 154 Wn. App. 1020, 2010 WL 264992 (2010).

[4] Id. at *4.

In 2006, APL sued the Department of Revenue, under RCW 82.32.180, for a refund of sales tax paid on the lease of these five cranes. APL alleged that "[b]ecause the container cranes became real property when they were permanently annexed to and integrated with Terminal 5 by the Port," APL's lease of Terminal 5 and the cranes was not subject to sales tax.

To determine whether the cranes are personal property or real property for tax purposes, the common law fixtures test is applied.[5]

The Department moved for summary judgment, which the trial court granted. APL sought review, and this court reversed.[6]

A bench trial followed. The court orally ruled in favor of the Department of Revenue. It later entered its written findings of fact and conclusions of law.

APL appeals.

## COMMON LAW OF FIXTURES

APL argues that the trial court erred when it denied APL's request for a sales tax refund after concluding that APL had not met its burden of proving the cranes were fixtures. The essence of the argument is that the cranes satisfy all three of the essential elements of the common law fixtures test. We hold that this record shows that the trial court correctly concluded that one of the required elements, intent of the Port, has not been proven. Thus, we need not address the other disputed element, annexation.

---

[5] Dep't of Revenue v. Boeing, 85 Wn.2d 663, 667, 538 P.2d 505 (1975).

[6] APL Ltd., 2010 WL 264992 at *4.

3

The determination of whether an article is a fixture is a mixed question of law and fact.[7] Following a bench trial, the reviewing court determines "whether substantial evidence supports the findings and whether the findings support the court's conclusions of law."[8] "Substantial evidence is evidence in sufficient quantum to persuade a fair-minded person of the truth of the stated premise."[9] The party challenging a finding of fact bears the burden of demonstrating that the finding is not supported by substantial evidence. [10] "If the standard is satisfied, a reviewing court will not substitute its judgment for that of the trial court even though it might have resolved a factual dispute differently."[11]

Unchallenged findings are verities on appeal.[12] Where the trial court mislabels a conclusion of law as a finding of fact, a court reviews the conclusion de novo.[13]

"It is well recognized that determining what constitutes a fixture as opposed to personal property is a difficult task that depends on the particular

---

[7] Boeing, 85 Wn.2d at 667.

[8] Casterline v. Roberts, 168 Wn. App. 376, 381, 284 P.3d 743 (2012).

[9] Schmidt v. Cornerstone Invs., Inc., 115 Wn.2d 148, 158, 795 P.2d 1143 (1990).

[10] Nordstrom Credit, Inc. v. Dep't of Revenue, 120 Wn.2d 935, 939-40, 845 P.2d 1331 (1993).

[11] Sunnyside Valley Irr. Dist. v. Dickie, 149 Wn.2d 873, 879-80, 73 P.3d 369 (2003).

[12] Robel v. Roundup Corp., 148 Wn.2d 35, 42, 59 P.3d 611 (2002).

[13] Hegwine v. Longview Fibre Co., Inc., 132 Wn. App. 546, 556, 132 P.3d 789 (2006).

facts of each case."[14] Under the common law test for fixtures, which is applied in tax cases of this type, a court considers the following three elements:

"(1) Actual annexation to the realty, or something appurtenant thereto; (2) application to the use or purpose to which that part of the realty with which it is connected is appropriated; and (3) the intention of the party making the annexation to make a permanent accession to the freehold."[15]

The annexation element, the adaption element, and the intent element must all be established before an article may be deemed to be a fixture.[16] Thus, if any one of these elements is absent, proof of a fixture is lacking.

In this case, both parties agree that the adaption element is met. For purposes of this appeal, the dispositive question is whether the intent element is satisfied.

### Intent of Port of Seattle

APL argues that the trial court erred when it concluded that the Port did not intend the cranes to be permanently attached to the realty. We disagree.

Intent is the most important element of the fixtures test.[17] "'[W]here the intent is discovered it is generally controlling.'"[18] "In fact, the other two criteria,

---

[14] Union Elevator & Warehouse Co., Inc. v. Dep't of Transp., 144 Wn. App. 593, 603, 183 P.3d 1097 (2008).

[15] Boeing, 85 Wn.2d at 667 (quoting Lipsett Steel Prods. v. King County, 67 Wn.2d 650, 652, 409 P.2d 475 (1965)).

[16] Id. at 668.

[17] Union Elevator, 144 Wn. App. at 603.

[18] Strong v. Sunset Copper Co., 9 Wn.2d 214, 230, 114 P.2d 526 (1941) (quoting Ballard v. Alaska Theatre Co., 93 Wash. 655, 662, 161 P. 478 (1916)).

annexation and adaption, have been reduced by the courts to simply indications of intention."[19]

Intent is "not to be gathered from the testimony of the annexor as to his actual state of mind."[20] Rather, evidence of intent is gathered from the circumstances at the time of installation.[21] "[A]ll pertinent factors reasonably bearing on the intent of the annexor should be considered in assessing the intent at the time of annexation including, but not being limited to, the nature of the article affixed, the relation and situation to the freehold of the annexor, the manner of annexation, and the purpose for which the annexation is made."[22]

State of Washington Department of Revenue v. The Boeing Co. is the leading case in this state addressing the question of fixtures for tax purposes and is substantially similar to this case.[23] There, the supreme court considered whether immense tools known as Boeing "fixed assembly jigs" were fixtures for tax purposes.[24] The jigs were used in the assembly of the Boeing 747 and worked to hold steady large sections of the aircraft.[25]

---

[19] 2 Wash. State Bar Ass'n, Real Property Deskbook §23.2(2)(c), at 23-6 (2009) (citing Boeing, 85 Wn.2d at 663).

[20] Boeing, 85 Wn.2d at 668.

[21] Id.

[22] Id.

[23] 85 Wn.2d 663, 538 P.2d 505 (1975).

[24] Id. at 666.

[25] Id. at 664.

In concluding that the jigs were not fixtures, the court determined that the third element, "the intent of Boeing to make a permanent annexation to the freehold," was lacking.[26] For this conclusion, the court considered seven pertinent factors.[27]

The court determined that two factors supported Boeing, who argued that the jigs were fixtures.[28] Those factors were:

> (1) Since Boeing was the owner of the freehold, it "arguably could be presumed that the intent of the annexation was to benefit the freehold and not to preserve the jigs as personalty."[29]

> (2) The jigs in question were "necessary to the production of the Boeing 747 and the record does not disclose any plans by Boeing to end the production of such aircraft."[30]

Nevertheless, the court then identified several other factors, which it stated "the cumulative effect of which convinces us that the annexation was not intended to be a permanent benefit to the freehold."[31]

For this conclusion it cited the following factors:

> (3) The plant itself could be used to manufacture other aircraft in which case the jigs would have to be discarded and new ones brought into the plant;

---

[26] Id. at 668.

[27] Id. at 668-670.

[28] Id. at 668-69.

[29] Id. at 669.

[30] Id.

[31] Id.

7

(4) The jigs were secured to the floor in such a manner that they could be easily removed without harm to the building itself;

(5) The jigs were designed so that they can be disassembled and moved without undue difficulty or harm and could be readily moved and transformed back into personalty;

(6) Boeing itself had considered the jigs to be personalty as they had reported them as such for tax purposes;

(7) The jigs were not listed as fixtures in the "code chart manual" which distinguished between fixtures and other tools.[32]

The court stated, "In sum, we do not think that the totality of the circumstances can reasonably be construed to indicate an intent by Boeing for the jigs to be a permanent accession to the freehold."[33]

Here, to determine the Port's intent, the trial court looked to the factors identified in Boeing. The court made 18 findings regarding the Port's intent.

First, the trial court considered "the moveability of the cranes." The court made several written findings on this. Specifically, the court found:

18. Container cranes are movable and can be relocated from one terminal to another. Over time there has been a history of moving Port-owned container cranes between terminals at the Port of Seattle or removing the container cranes from the Port of Seattle terminal facilities.

. . .

20. When 100-foot gauge cranes at the Port, including the T5 Cranes, are moved from their crane rails, the practice has been to construct temporary rails perpendicular to the working rails and to move the crane onto those temporary rails where the crane can be moved a distance from the working rails. For instance, when two of the T5 Cranes were modified to increase their height, one of

---

[32] See id. at 669-70.

[33] Id. at 670-71.

the cranes was moved onto temporary rails perpendicular to the crane rails after being modified. This allowed the crane to be moved back, away from the working rails, and then to be repositioned on the crane rails.

. . .

22. There is a domestic and international market for used 100-gauge container cranes. In the past the Port of Seattle has sold 50 gauge container cranes to smaller ports such as the Port of Olympia. These cranes were not disassembled but were moved by barge.[34]

These unchallenged findings are verities on appeal. Additionally, they are consistent with two of the factors considered in Boeing. They are consistent with the fourth Boeing factor—that the manner in which the items are secured is indicative of intent that they be easily removable.[35] Additionally, they are consistent with the fifth Boeing factor—that the items were designed in such a manner that they could be moved without undue difficulty or harm and transformed back into personalty.

APL argues that "[t]he issue is not that an item *can be* removed, but whether it was manufactured or installed with an intent that it be removed." While this is the overall inquiry, whether an item can be removed is relevant to the fourth and fifth considerations identified in Boeing.[36] Thus, this argument is not persuasive.

---

[34] Clerk's Papers at 201-02.

[35] Boeing, 85 Wn.2d at 669.

[36] Id.

APL attempts to distinguish Boeing by arguing that there, the jigs were designed to be disassembled and moved, and here, the cranes were not specifically designed to be disassembled or moved. APL cites to testimony from the executive director of the Port to support this assertion.

But, in Boeing, the court relied on this fact to show that the jigs could be disassembled without harm and transformed back into personalty.[37] Here, even if the jigs were not designed to be easily disassembled, the unchallenged findings show that they could be moved, had been moved in the past, could be sold, and had been sold in the past.

Further, the court found that there is a domestic and international market for used 100-gauge container cranes, and in the past, the Port had sold cranes that were not disassembled. Accordingly, even if these cranes were not designed to be disassembled, they could be readily moved and thus transformed back into personalty. Thus, despite the factual distinction, this evidence is nonetheless consistent with the fifth Boeing factor.

Next, the court looked to the Port's categorization of the cranes for tax purposes.

The court made three findings on the Port's tax treatment of the cranes, including the following:

> 43. Additional evidence of the Port's intention regarding the sales tax treatment of its purchase of container cranes is found in Exhibits 124 and 125. Exhibit 125 is a report seeking approval of the purchase of the T5 Cranes, with sales tax listed as zero. Exhibit 124 is a slightly later proposal in 1986 with the same tax

---

[37] Id.

treatment—sales tax listed as zero. On this record, the only sales tax exemption that would apply to the purchase of these cranes is the purchase for resale exemption. Again, if the Port had intended the cranes to be fixtures, it would have paid retail sales tax on the purchase and would not have billed the tax on the subsequent lease of the cranes to the tenant. Instead, the Port did just the opposite; it did not pay the sales tax on the purchase, but charged the tenant the sales tax on the lease. This is persuasive circumstantial evidence that the Port intended the cranes not be affixed to the land.[38]

As the court points out, Exhibits 124 and 125, reflect that the estimated sales tax is zero. Additional documents in the record show that the state sales tax was listed as "Exempt." This is substantial evidence to support the trial court's findings. Additionally, it is consistent with the sixth factor identified in Boeing.

APL argues that "critically, no witness actually knew whether the Port had paid sales tax on the T-5 Cranes, or, if not, why not." It also argues that if the Port had purchased the cranes for resale, the law required a "resale certificate," and the DOR did not present any evidence of such a certificate. Thus, it argues that "no evidence supports a finding that the Port claimed a resale exemption when purchasing the cranes." This argument is not persuasive.

The essence of this argument is that APL disagrees with the trial court's factual finding because other evidence allegedly undercuts the evidence on which the court relied for its finding. This is a dispute over whether substantial evidence supports the finding. As we previously discussed, the billing statements and memorandums in the record support the trial court's findings that

---

[38] Clerk's Papers at 206-07.

the Port did not pay sales tax. It was for the trial court to determine the weight of this evidence, and it did so.

Finally, the court addressed "documented categorization." For this, the court made several findings about the lease agreement and the Port's policy statements. Among those are the following:

> 30. The lease agreement contains direct evidence that the Port intended the container cranes to be personal property and not fixtures. The initial lease between the parties (Def. Ex. 101) under section (1)(a) described "the Premises" as consisting of approximately 77 acres of land and improvements. The improvements covered under this section "are fully described on Exhibit B" to the initial lease. The improvements described in Exhibit B do not include container cranes. Instead, Exhibit B describes three categories of improvements. In Part I, the listed improvements are not amortized. In Part II, the listed improvements are amortized, and the costs recovered over the term of the lease. In Part III, the listed improvements are amortized but not paid for unless APL terminates the lease early, and then payment is due for those improvements or an amortized schedule. Included in these schedules are many items that could be characterized as personal property, not fixtures. Examples include fencing and gates, truck scales, tanks, and reefer receptacles to name a few. The T5 Cranes are not listed as improvements on Exhibit B.
>
> 31. Section 9(a) of the initial lease (Def. ex. 101-13) provides, "All improvements identified in Exhibit B including those the payment of which is amortized by Lessee shall at once, upon completion [become] a part of the realty and become the property of the Port." This is an unmistakable declaration that the improvements listed in Exhibit B are fixtures. As previously noted, the T5 Cranes are not listed on Exhibit B.[39]

The trial court made four other similar findings related to other lease terms.

---

[39] Id. at 203-04.

Additionally, it looked to the Port Harbor Development Strategy and the Container Terminal Development Plan. The court found that "[a] close reading of all relevant parts of both these documents supports the Department's contention that the Port of Seattle intended the T5 Cranes to be equipment held as 'inventory,' not fixtures."[40] For example, the trial court pointed to specific language in the plan that refers to the "crane inventory."

The language in the lease and in these documents is similar to the evidence presented in Boeing.[41] The Port's own categorization of the cranes is objective evidence that it did not intend for the cranes to be fixtures. As Boeing noted, "If Boeing had intended for the jigs to be a permanent accession to the freehold, it seems more likely that they would have been listed with the rest of the fixtures."[42] Similarly, here, if the Port intended for the cranes to be fixtures, it is more likely that it would have listed them as "improvements" in the lease. It did not do so. Overall, this documented categorization, including the language of the lease agreement, and the Port's policy statements, is consistent with Boeing's seventh factor.

In sum, there is substantial evidence to support the trial court's challenged findings. Additionally, these findings, along with the unchallenged findings, show that most of the factors considered pertinent in Boeing are also present in this case. The cranes could be easily removed, the cranes could be readily moved

---

[40] Id. at 205-06.

[41] Boeing, 85 Wn.2d at 670.

[42] Id.

and transformed back into personalty, the Port considered the cranes personalty for tax purposes, and the Port did not list the cranes as improvements in the lease. Looking to this evidence, and considering the totality of the circumstances, the findings support the trial court's conclusion that the Port did not intend for the cranes to be treated as fixtures.

APL makes a number of additional arguments that the trial court erred when it concluded that the Port did not intend to permanently affix the cranes to the realty. None are persuasive.

First, APL argues that "[b]ecause the cranes were annexed to the realty, APL was entitled to a legal presumption that the Port intended to permanently enrich the freehold," and that the trial court erred in refusing to apply a presumption of intent in APL's favor. It is true that "when the annexation of a fixture is made by the owner of the property, the presumption is that it was annexed with the intention of enriching the freehold."[43] But APL is wrong in its assertion about how the presumption applies for several reasons.

To start with, the trial court declined to apply the presumption because it stated that "[t]he presumption works where the evidence of annexation is clear and the issue is whether the owner intended that clear result. But where annexation is not clear without resorting to examining what the owner intended, application of the presumption serves no useful purpose."[44] This approach is

---

[43] Nearhoff v. Rucker, 156 Wash. 621, 628, 287 P. 658 (1930).

[44] Clerk's Papers at 217.

logical under these circumstances, and APL's argument to the contrary is not persuasive.

Next, APL cites to <u>Western Ag Land Partners v. Department of Revenue</u> and <u>Strain v. Green</u> for the proposition that, "Where the presumption applies, the burden shifts to the defendant to prove that, notwithstanding the annexation, the annexor intended the item to remain personal property."[45] While those cases acknowledge that such a presumption would arise, they do not discuss shifting the burden of proof on the intent element.[46] And, in this case, the burden of proof is on APL, because APL is the taxpayer.[47] APL fails to cite any relevant authority that supports the implicit argument it makes that this general rule does not apply to this case. Further, in <u>Western Ag</u>, the court indicated that the intent prong was satisfied given the presumption and "[a]bsent some evidence rebutting this presumption."[48] In contrast, here, it is clear that there is more than "some evidence" to rebut the presumption. Accordingly, APL's reliance on these cases is not helpful.

Finally, even if the presumption did apply, in <u>Boeing</u>, the court considered the presumption only as one factor that supported Boeing's argument that the

---

[45] Brief of Appellants at 25 (citing <u>Western Ag Land Partners v. Dep't of Revenue</u>, 43 Wn. App. 167, 174, 716 P.2d 310 (1986); <u>Strain v. Green</u>, 25 Wn.2d 692, 700, 172 P.2d 216 (1946)).

[46] <u>See</u> <u>Western Ag</u>, 43 Wn. App. at 173-74; <u>Strain</u>, 25 Wn.2d at 700.

[47] <u>See</u> RCW 82.32.180; Clerk's Papers at 207.

[48] <u>Western Ag</u>, 43 Wn. App. at 174.

15

jigs were fixtures.[49] Looking at the totality of the circumstances, the Boeing court nonetheless concluded that the jigs were not fixtures, given the other factors that did not support Boeing. Similarly, here, even if we agreed that the presumption supported APL, this would only suggest that the first factor identified in Boeing favors APL. But still, considering all other pertinent factors and the totality of the circumstances, the trial court's conclusion is firmly supported by Boeing.

Second, APL argues that the Port installed the cranes with the intent that they remain part of Terminal 5 for their entire useful lives. It first points to the testimony of the Port's executive director who stated that it was the Port's view that the cranes were "an integral part of the container facility and were not going to be moved." APL also argues that the Port spent tens of millions of dollars to rebuild Terminal 5 to accommodate the cranes, and that the lease term was for 30 years, which is the expected useful life of a T5 crane.

Notwithstanding the above points, evidence of intent comes from objective evidence existing at the time of annexation, not subjective belief.[50] Accordingly, evidence relating to subjective intent, such as the Port director's opinion, is not relevant to the inquiry.

Moreover, the trial court did not make findings for any of these evidentiary points on which APL relies. And an appellate court "will not 'disturb findings of

---

[49] Boeing, 85 Wn.2d at 668-69.

[50] Id.

fact supported by substantial evidence even if there is conflicting evidence.'"[51] Accordingly, because there is substantial evidence to support the trial court's findings, any conflicting evidence does not alter our analysis.

To summarize, APL fails in its burden to show that the Port intended to make a permanent accession to the Port's property when it allegedly annexed the cranes to the property. Accordingly, we need not address whether there was truly an annexation of the cranes to the Port's property.

We affirm the judgment.

_____ Cox, J.

WE CONCUR:

_____        _____

---

[51] McCleary v. State, 173 Wn.2d 477, 514, 269 P.3d 227 (2012) (quoting Merriman v. Cokeley, 168 Wn.2d 627, 631, 230 P.3d 162 (2010)).