## PAUSE *v.* THE CITY OF ATLANTA.

1. A leasehold is such an estate as that, if in the construction by the municipal authorities of a city of a public improvement in one of its streets, the estate of one holding such an interest in real property be damaged, he may sustain an action.

2. The construction in a street, by the municipal authorities of a city, of any public improvement which results in permanent injury to the property of an abutting lot owner, gives to such owner a right of action for damages resulting to him therefrom. ·

3. Where according to the plan of a proposed public improvement its completion must inevitably result either in the total exclusion of a leaseholder from his premises, or render the same so inconvenient as to render it valueless to him for the purposes for which it is leased, he may abandon his lease and vacate the premises whenever in the execution of the projected plan of construction the work has so far progressed as virtually to destroy his lease and thus prevent the enjoyment by him of his estate, and thereupon may sue for and recover from the city the dimunition, during the remainder of his unexpired term, in the market value of the premises for rent, caused by the construction of such improvement.

4. In such case, neither the profits of the business carried on upon the premises so leased, nor the cost of fixtures or other improvements placed therein, nor of articles purchased for the purpose of enabling the lessee to conduct such business, nor the dimunition in value of such fixtures, improvements or articles as are removed by the lessee from the premises upon leaving the same, are recoverable as damages; but the increased value of the premises for rent in consequence of the putting in of such fixtures and improvements may be considered in computing the damages to the leasehold estate.

5. On the trial of such a case, it is competent for the plaintiff to prove that the business in question was in fact profitable, not

for the purpose of recovering any loss in profits, but solely to illustrate and throw light upon the value of the premises for rent.

6. An "option" to extend for two years longer a valid three years lease at the mutual agreement of the parties to said lease, confers upon the lessee no legal right to hold the premises for a term longer than three years, and carries with it no right to recover for damages to the rental value of the estate after the expiration of that term.

January 13, 1896.

Action for damages.    Before Judge Van Epps.    City court of Atlanta.    May term, 1895.

Mrs. Anna Pause brought suit against the City of Atlanta for damages resulting to her by the building of a bridge on Forsyth street, whereby her business of keeping a restaurant and bar and selling fish and oysters was broken up and destroyed.    A nonsuit was granted, and she excepted.

It appears, that on September 16, 1890, she took a lease covering the basement at the rear side of the old capitol building, opening on the west side of Forsyth street, at a monthly rental of $50, with the option to extend the same to five years by mutual agreement of the lessor and lessee. The lease authorized the lessee to take away any fixtures put by her on the premises, which could be removed without injury to the building.    In September, 1891, she took an additional room at $15 per month.    In order to carry on the business, she necessarily expended $4,175 in restaurant fixtures, bar fixtures, gas fixtures, dining-room fixtures, stoves and pipes, ice-box and furnishing for pantry, kitchen fixtures, and fly-fan and machinery.    By reason of the favorable location of the premises, the same being centrally situated in the city, and by reason of the skill and energy devoted to the business by her husband as her agent, the leased premises and the option to continue the lease were worth $10,000 to her.    The city commenced the construction of the bridge in the spring of 1891, and finished it in July, 1893.    Work was begun next to Alabama street and

proceeded toward plaintiff's premises, which were near the other end of the bridge, towards Marietta street. The commencement of the bridge obstructed the street, and this obstruction increased as the bridge approached her premises. When it reached the same, it completely shut off all egress from and ingress to said premises by way of said street, and excluded much light and air from the adjacent side of the building. To carry on the business it was necessary that the entrances from Forsyth street be kept open and unobstructed. This street was a thoroughfare with considerable travel. When the construction of the bridge was commenced, it greatly interfered with travel along said street. As the bridge approached plaintiff's premises, it cut off more and more resort to the same. Before the business was affected unfavorably by the bridge, there was much resort to said premises, such being from 50 to 500 persons a day; but the greater volume of travel there was along Marietta street all the time. Plaintiff occupied the premises until January 1, 1892, when the bridge had approached so near the entrances to said premises that her custom had gradually fallen off. Holes were being dug in the street near the sidewalk and near said entrances, for the foundation of the abutments of the bridge; and rocks and large stones were being placed in the street near these entrances. Her custom had fallen off to such extent that the business could be carried on only at a loss. She therefore threw up the lease and abandoned the premises, having as required by the lease paid $130 rental for January and February, 1892. At and after January 1, 1892, said premises were of no market value whatever for restaurant and bar business, and she could not have found a tenant for them at any price. At that date the bridge was not finished, nor were her doors closed by it for several months thereafter. When it was finished in July, 1893, it closed all entrances from the street, leaving only the entrances from the alley back of the building. When she threw up the lease the entrances were all

open, and the sidewalk had been interfered with only by the removal of one or two paving stones near the entrance farthest from Marietta street.     Upon abandoning the premises as stated, plaintiff, having no use for the articles before mentioned, in which she had made investment for carrying on the business, disposed of most of them for the best prices they would bring, $610; and still has on hand two of them worth $125.

Two witnesses testified, that by reason of the improvements made by plaintiff, her premises were worth $150 for rent if they had not been obstructed by the bridge.     The agent of the lessors testified, that the premises were worth for rent $15 to $20 a month additional to the lease rate, because of such improvements.     It appears that the restaurant fixtures before mentioned consisted of flooring and ceiling put in, a stairway, six partitions, flues, doors, locks and windows.     Among the dining-room fixtures were wall-papering, gas-fixtures and water and sewer connections, the cost of each being given, which were a total loss to plaintiff.

*John C. Reed* and *Mord Foote, Jr.*, for plaintiff.
*J. A. Anderson* and *Fulton Colville*, for defendant.

ATKINSON, Justice.

The plaintiff occupied certain premises in the City of Atlanta, which were used by her in the business of keeping a restaurant and bar, and selling fish and oysters. She occupied the premises under a lease at a stipulated monthly rental for an agreed term of three years, and upon an option, by mutual agreement of the lessor and lessee, to extend the same to a term of five years.     Her place of business was well located and properly fitted up at considerable expense.     While engaged in the conduct of this business under the lease in question, the municipal authorities of the City of Atlanta commenced the construction of a certain bridge, in the building of

which, under the plan adopted, the entrance to plaintiff's place of business would be and was in fact so far obstructed as practically to cut her off from the ordinary means of access to her place of business, which she had previously enjoyed; and in addition to this, cut off the light and air from her place of business, so as to render her premises practically valueless for the purposes for which they were leased.   Before the day upon which the door of her place of business was actually obstructed by the progress of the contemplated work, her business, in consequence of the obstruction to the entrance to her restaurant, became so unprofitable that she was compelled to abandon it, and to surrender the premises, in consequence of which she sustained damage.   For the injuries thus sustained, she brought an action, and upon the introduction of evidence, which, if admitted, might have justified the jury in finding the facts above stated to be true, she was nonsuited upon the ground that she had shown no right of action against the city.   In addition to the question made upon the motion for nonsuit, the plaintiff offered to prove that she had made certain improvements upon the premises at a stated expense, and that in consequence of the injury complained of, these improvements were depreciated in value; and further offered to prove the volume of her business, the profits derived from its conduct, the value of the movable property and loss on the same; all of which testimony was excluded by the court.

1. In the consideration of the questions made by the record in this case, for convenience of arrangement we will first address ourselves to the inquiry as to whether the plaintiff owned such an interest in the premises as would justify a recovery by her, admitting, for the purposes of that inquiry, that the municipal authorities were otherwise liable; and we think that this question may be answered in the affirmative, upon authority of the ruling of this court in the case of Bentley v. The. City of Atlanta, 92 Ga. 623, in which it is held, "that a tenant, although he has no estate

in the land, is the owner of its use for the term of his rent contract, and can recover damages for any injury to such use occasioned by the erection and maintenance of a public nuisance in the street adjacent to or in the immediate neighborhood of the premises." If a leasehold interest be sufficient to maintain such an action, it is certainly sufficient to maintain an action for damages sustained in consequence of torts directly affecting the value of the estate itself.   A leasehold interest in premises for a definite term is property within the meaning of that word as it is employed in paragraph 1, section 3, article 1 of the constitution of this State, in which provision is made against the taking or damaging of private property for public purposes without just and adequate compensation being first paid. If a tenant be deprived of his leasehold interest in consequence of the appropriation by the public to public uses of the property upon which his leasehold estate rests, it cannot be doubted that he is deprived of his property; and hence we conclude, that the holder of a lease has such an interest in premises as will enable him to maintain an action for damages resulting to his leasehold estate, sustained in consequence of the construction of a duly authorized public improvement, whether such damage results from the negligence of the municipal authorities, or otherwise.

2. The case of *Tuggle* v. *Mayor and Council of the City of Atlanta*, 57 *Ga.* 114, was decided prior to the adoption of the constitution of 1877, and since, by the constitution of 1868, there was no prohibition against mere damage to property without just compensation, the liability of the municipal corporation to an owner damaged in consequence of the construction of a bridge in a public street depended upon the question as to whether or not the municipal authorities were negligent, and in consequence of their negligence inflicted an injury upon the property owner peculiar to himself, and not shared in by the general public; and it was properly held, under the law as it stood at that time, that

the action could not be maintained, it not appearing that the municipal authorities were in fact guilty of any negligence in the premises. The case of *Green* v. *The City of Atlanta,* 67 *Ga.* 386, which was one involving the right of a property owner to recover consequential damages resulting from the change of a grade in a street, and as well the case of *Campbell* v. *Metropolitan Street Railroad,* 82 *Ga.* 320, which involved the right of a street railroad company to construct its railway along the line of the public streets of a city, both arose subsequent to the adoption of the constitutional provision hereinbefore referred to, as it appears in the present constitution of this State. In both of these cases it was ruled practically, that, without reference to the question of negligence, if the city, in the progress of a public improvement, or the railroad company constructing its railroad under authority of a public charter, in any way damaged the property of a citizen, the latter, for such damages, might maintain an action. While it is perhaps unnecessary to cite authority for the proposition that an insertion of the words "or damaged," in the constitutional provision above referred to, was intended to and did afford to the private citizen an additional safeguard against the infliction of injuries by the public, it may not be unprofitable to refer to some outside authorities upon the subject; and we therefore cite in that connection the case of Rigney *v.* City of Chicago, 102 Ill. 64, which was afterwards cited approvingly in the case of Chicago *v.* Taylor, 125 U. S. Rep. 161. Elsewhere, as in the State of Georgia prior to the adoption of the constitution of 1877, it was held, under constitutional provisions which prohibited only the taking of property, that all such loss and inconvenience as result from temporarily obstructing the use of public highways, whether by land or water, in consequence of improvements by the public authorities, could not be made the basis of an action for damages; but in order to justify a recovery in such case, there must have been an actual, physical taking

and appropriation of private property.    Northern Trans-
portation Co. *v.* Chicago, 99 U. S. 635; Troy & Boston R.
R. Co. *v.* Northern Turnpike Co., 16 Barb. 100; Plant *v.*
Long Island R. R. Co., 10 Barb. 26.    But in other States
where constitutional provisions similar to the one in the
present constitution of Georgia, which is now under dis-
cussion, have been construed, the rule has been stated, that
for consequential damages traceable to the public, and
which injuriously affect the property of the citizen, there
may be a recovery, as distinguishable from those injuries
which affect only the sensibilities or the business of the
individual.    Accordingly, the Supreme Court of Illinois,
in construing a constitutional provision of force in that
State similar to the one under consideration, pronounced
as follows:    "While it is clear that the present constitution
was intended to afford redress in a certain class of cases for
which there was no remedy under the constitution, yet we
think it equally clear that it was not intended to reach every
possible injury that might be occasioned by a public im-
provement.    There are certain injuries which are necessarily
incident to the ownership of property in towns or cities,
which directly impair the value of private property, for
which the law does not, and has never afforded any relief.
For instance, the building of a jail, police station or the
like, will generally cause a direct depreciation in the value
of neighboring property, yet it is clearly a case of *damnum
absque injuria.*    So as to an obstruction in a public street
—if it does not practically affect the use or enjoyment of
neighboring property, and thereby impair its value, no
action will lie.    In all cases, to warrant a recovery it must
appear there has been some direct physical disturbance
of a right, either public or private, which the plaintiff
enjoys in connection with his property, and which gives to
it an additional value, and that by reason of such dis-
turbance he has sustained a special damage with respect to
his property, in excess of that sustained by the public gener-

ally.   In the absence of any statutory or constitutional provisions on the subject, the common law afforded redress in all such cases, and we have no doubt it was the intention of the framers of the present constitution to require compensation to be made in all cases where, but for some legislative enactment, an action would lie by the common law." 102 Ill. 64-80.   This rule seems to have been the one recognized and adopted in the English courts where damages are awarded in favor of a property owner where property has been "injuriously affected" by the construction of a public improvement, which term seems to have been recognized as an equivalent of the expression "damaged," as used in our constitution.   See 2 Best & Smith, 605; Beckitt *v.* Midland Ry. Co., L. R., 1 C. P. 241; on appeal, 3 C. P. 82; McCarthy *v.* Metropolitan etc. Works, L. R., 7 C. P. 508; Hall *v.* Mayor of Bristol, L. R., 2 C. P. 322; East & West India Docks *v.* Gattke, 3 McN. & G. 155.   The word "damage" embraces more than the mere physical taking of property, and is not restricted to cases where the owner is entitled to recover as for a tort at common law.   66 Cal. 492.   It seems that this language is intended to cover all cases in which, even in the proper prosecution of a public work or purpose, the right of a person in property or the property itself is in a pecuniary way injuriously affected. 63 Texas, 467; 14 Neb. 550; 45 Ark. 429; 67 *Ga.* 386; 7 Col. 113; 10 Col. 403; 17 West Va. 396.   The damages, therefore, that an individual may recover for injuries to his property need not necessarily be caused by acts amounting to a trespass, or by an actual physical invasion of his real estate; but if his property be depreciated in value by his being deprived of some right of user or enjoyment growing out of and appurtenant to his estate as the direct consequence of the construction and use of any public improvement, his right of action is complete, and he may recover to the extent of the injury sustained.   C. & W. I. R. R. *v.* Ayers, 106 Ills. 511; East St. Louis *v.* O'Flynn, 19 App. Ct. Rep. (Ills.)

66. Accordingly it has been held that interfering with access to premises, by impeding or rendering difficult ingress or egress, is such a taking and damaging as entitles.the party injured to compensation under a provision for compensation where property is damaged. 22 Am. & Eng. Cor. Cases, 393; Cooley on Const. Limit. p. 690, note 3 on same page, and cases there cited. Compensation has been awarded for the laying of a railroad track in a street, the fee of which the abutter does not own. *Campbell* v. *Metropolitan St. R. R. Co.*, 82 *Ga.* 321. For the laying of a cable road by the side of a horse railroad. Cooley's Const. Limit. *supra.* The rule seems to be deducible from the decisions of the courts of other States, construing constitutional provisions similar to our own, that if the owner of property, because of the permanent physical improvement itself, suffers damages by reason of the permanent diminution in the value of his property or estate, as distinguished from mere personal inconvenience, he has a right of action for such damage; nor is it material whether the property damaged abuts directly upon the improvement, or is distant therefrom. In the case of McCarthy v. Metropolitan Board of Works, L. R., 7 C. P. 508, the plaintiff resided and carried on business as a dealer in lime, brick, sand, ballast, etc., on premises near a dock known as Whitefriar's dock, which was a public dock on the Thames. The dock was separated from plaintiff's premises by a public street 20 feet wide, and the distance from this street to the river along the dock was 352 feet. The dock was largely used by the plaintiff in the way of his business, but he had no right or easement in the dock other than as one of the public, nor was there appurtenant or otherwise belonging to his premises any other right or privilege in or to the dock. By reason of its proximity to the plaintiff's premises and the access thereby afforded to and from the Thames, the premises were rendered more valuable to sell or occupy with reference to the uses to which any owner might put them.

In the execution of the works authorized by the Thames embankment acts, a solid embankment was carried along the foreshore of the Thames, thus permanently stopping up and destroying Whitfriar's dock. By reason thereof access along the dock from the plaintiff's premises to and from the Thames was prevented, and his premises were permanently damaged and diminished in value. Plaintiff recovered judgment in the Court of Common Pleas, which held his premises injuriously affected; and this decision was afterwards affirmed by the Exchequer Chamber and House of Lords. See 7 Appeal Cases, 259; Lewis on Eminent Domain, §227, p. 306, note 3. See other English cases there cited. In Rigney *v.* Chicago, 102 Ills. 64, it appeared that Rigney, the plaintiff, owned an improved lot on one street, which street was intersected at right angles by another at a point 220 feet distant from the plaintiff's property. The city built on the intersecting street, over the street upon which plaintiff's property was situated, a viaduct, so as to entirely prevent access to the intersecting street from the street upon which plaintiff's property was situated, except by stairs. The evidence showed that the intersecting street was an important thoroughfare upon which horse-car lines were operated, affording communication with all parts of the city. No change whatever was made in the street upon which the property of plaintiff abutted, either in front of his property, or elsewhere, but as the result of the construction of the viaduct, and cutting off access to the intersecting street, plaintiff's property was damaged. The court there held, under a constitutional provision similar to ours, that the property was damaged within the meaning of the constitution. Referring to these cases, Lewis on Eminent Domain says: "They seem to settle the doctrine that an obstruction or interference with a public street or way need not necessarily be in front of or contiguous to the property claimed to be affected thereby, in order to authorize a recovery. It is sufficient if it is such an obstruction or interference as

produces a diminution in the value of the property, as dis-
tinguished from mere personal inconvenience to the owner."
Lewis on Eminent Domain, §227, p. 307, citing Caledonian
Ry. Co. *v.* Walker's trustees, 7 Appeal Cases, 259.

In considering the questions made in this case, a dis-
tinction should be borne in mind between those cases where
one seeks to recover because of the appropriation by the
public to the public use of private property, and damages
to one's property sustained in consequence of the con-
struction of such public improvement, and that other class
of cases in which, though one's property be neither appro-
priated nor damaged, yet in consequence of the construction
of such an improvement one suffers damage resulting from
personal inconvenience, and consequent damage in the con-
duct of one's business.   In the former cases the right of
compensation is a matter of principle; the amount of
damage, a mere matter of degree.   However slight or how-
ever great one's damage, may be, he is nevertheless entitled
to compensation.   In the latter class of cases something
more must appear than mere damage or inconvenience.   It
must be made to appear that in the construction of such an
improvement the municipal authorities have been guilty of
negligence, omission of duty or negligent commission of an
act authorized by law, in order to authorize a recovery.   In
the one case the constitution allows compensation because
of the damage to property; in the other case the right of
recovery rests upon the general law and depends upon the
negligence of the offending corporation.   Ordinarily muni-
cipal authorities judge of the means by which a contem-
plated public improvement will be accomplished, and if the
municipal authorities adopt such means as in their judg-
ment are best adapted to the accomplishment of the pro-
posed purpose, they will not be liable, unless, in the execu-
tion of that purpose, by some act of negligence they inflict
injury to the person, property or business of an individual
in which the general public does not share.   These principles

are clearly deducible from the three Georgia cases to which reference has hereinbefore first been made, and they seem to be borne out by the current of authorities elsewhere.

In determining the question now submitted for our consideration, it is not necessary for us to state the rule which will be adopted by this court where the obstruction is so remote from the property of the person claiming to be injured thereby as to render it doubtful whether the damage complained of may be fairly attributed to the obstruction itself, or to other and independent causes. In the present case the property damaged in consequence of the public improvement, was directly affected by the improvement itself; and hence we hold, that inasmuch as the plaintiff had a property in the thing injured, she is entitled, under the constitutional provision of force in this State, to which we have hereinbefore referred, to recover the damage sustained by her.

3. It was insisted in the present case that the plaintiff was not entitled to recover, because she abandoned her lease before access to her property was actually cut off by the projected public improvement. We do not think this is a good reply to her demand; she had an existing estate in the property, and when it became manifest to her that, according to the plan of the proposed public improvement, its completion would result either in her total exclusion from her premises, or make the same so inconvenient as to render it valueless to her for the purposes for which it was leased, she could properly abandon her lease, and vacate the premises, whenever in the execution of the projected plan of construction the work had so far progressed as virtually to destroy her lease by preventing the enjoyment of her estate; and a mere surrender by her under such circumstances will not be deemed a voluntary abandonment of the premises; she would be nevertheless entitled to recover for her unexpired time the market value of her premises for rent.

4. The measure of her damages is the injury to her property which is injuriously affected by the public improvement; in arriving at that damage, neither the profits in the business conducted on the premises, nor the cost to the tenant of fixtures and improvements placed therein, nor the articles purchased for the purpose of enabling the lessee to conduct the business, nor diminution in the value of fixtures, improvements or articles such as are removed by the lessee, can be recovered as damages; but the increased value of the premises for rent in consequence of the putting in of such fixtures and improvements may properly be considered in computing the damages to the leasehold estate.

5. In such a case the profits of the business are not recoverable by way of damages, but evidence that the business was profitable is admissible to illustrate and throw light upon the value of the premises for rent.

6. Nor was it competent upon the part of the leaseholder to prove that she had an option upon the premises for a term of years longer than three, it appearing that the option was not to be exercised at her will alone, but was dependent likewise upon the concurrence of the landlord. Such testimony would be irrelevant, as, under the peculiar terms of the option claimed in the present case, the leaseholder acquired no interest, but only a privilege of making a new contract with her landlord at the termination of her lease, the new contract being dependent upon the consent of the landlord; and this she would have had the right to have done with or without the alleged option. It having, therefore, no market value, it ought not to have been considered, and was properly rejected by the court as irrelevant.

Upon the main questions in the case, the court erred in directing a nonsuit, and the judgment is        *Reversed.*