**Floyd N. LEMMONS**

v.

**The UNITED STATES.**

**No. 513–71.**

United States Court of Claims.
May 15, 1974.

James C. Meers, Washington, D. C., attorney of record, for plaintiffs. John E. Early, Evansville, Ind., of counsel.

Joel Henry Meshorer, Washington, D. C., with whom was Asst. Atty. Gen. Wallace H. Johnson, for defendant.

Before COWEN, Chief Judge, DAVIS and BENNETT, Judges.

## OPINION

### PER CURIAM:

This case comes before the court on defendant's motion, filed February 26, 1974, requesting that the court adopt the recommended decision of Trial Judge Thomas J. Lydon, filed January 18, 1974, pursuant to Rule 134(h), as the basis for its judgment in this case since plaintiff has failed to file a notice of intention to except thereto and the time for so filing pursuant to the Rules of the court has expired. Upon consideration thereof, without oral argument, since the court agrees with the said decision, as hereinafter set forth,* it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, defendant's motion of February 26, 1974, is granted, plaintiff is not entitled to recover and the petition is dismissed.

### OPINION OF TRIAL JUDGE

LYDON, Trial Judge:

Plaintiff seeks to recover damages in the form of just compensation for an alleged taking by defendant, acting through the Corps of Engineers, Department of the Army, of his property on or about June 25, 1965. Plaintiff claims he is entitled to recover the value of a sand and gravel tipple (which he estimates to be $55,000), the labor costs which would be incurred in installing a new tipple in another location (which he estimates would be $35,000), and the value of his leasehold interest (which he estimates to be $15,000).

The basic question presented in this case is whether there was a taking by defendant of plaintiff's property entitling him to a just compensation award. Subsidiary questions to which the parties have directed their briefs are whether the tipple is to be considered a part of the realty, as claimed by plaintiff, or personalty, the position advanced by defendant, and whether plaintiff's

---

* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed January 18, 1974, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

leasehold interest was a viable property right possessing value on or about June 25, 1965. For reasons which follow, it is concluded there was no compensable taking by defendant of plaintiff's property.

In 1957, plaintiff was President of Mid-West Sand and Gravel Co., Inc. (Mid-West) which had its main office in Boonville, Indiana. For purposes of this litigation plaintiff and Mid-West will be considered one and the same. On November. 23, 1957, plaintiff, as lessee, entered into a special purpose "Sand And Gravel Lease", subsequently reassigned to Mid-West, with Marion D. Vanada and his wife, Lillian E. Vanada, lessors, whereby plaintiff was given the right to conduct a sand and gravel business on property, known as tract 114, owned by the lessors. Under this lease. plaintiff had the right to dredge and pump sand and gravel from the Ohio River and to process the sand and gravel by means of a tipple located on the riverbank on tract 114 for commercial sale. At or about the same time that he entered into the lease, plaintiff purchased from the lessors the sand and gravel tipple consisting at the time of three hoppers or bins, which was then located on tract 114—having been moved there from an upstream location at a prior time.

The lease was for a term of 20 years with the lessee having the privilege of renewing the lease for a period of 5 years thereafter. It set up a schedule of rents and royalties which plaintiff was to pay the lessors, said schedule varying within different established time periods. For example, it provided that from January 1, 1965, to and including December 31, 1969, plaintiff was to pay the lessors an amount per ton of sand and gravel removed equal to 9 percent of the prevailing market price per ton for sand and gravel at the Evansville, Indiana, market as of January 1, 1965. Plaintiff, in any event, had to pay the lessors at least $2,000 annually as rent and royalties under the lease. The lease provided in pertinent part:

\* \* \* \* \* \*

(1) \* \* \* \* \*

(h) Lessee shall have the right to remove all of his personal property and improvements made by him on said real estate at the end of the term of this lease.

(2) Lessors agree to permit the Lessee to use a reasonable portion of their land on the river bank [refers to tract 114] for hoppers [the tipple] or other equipment necessary for Lessee's operation \* \* \*.

(3) Lessee agrees to carry on the work of pumping sand and gravel in a diligent manner. Lessee's failure to pump sand and gravel for a continuous period of six (6) months or more shall constitute an· abandonment and termination of this lease, unless the river conditions, strikes, or other unavoidable circumstances in some way prevent the Lessee from conducting a normal operation.

\* \* \* \* \* \*

The lease also allowed plaintiff to use a plot of land [known as tract 111] owned by the lessors for storage of sand and gravel, as well as use of a scales office building and maintenance shop located thereon.

It is important to understand that plaintiff's lease was a special purpose lease and only empowered him to conduct a sand and gravel business on the lessor's property. Plaintiff's sole purpose in obtaining the lease and purchasing the tipple was to engage in the business of producing and selling sand and gravel, dredged from the Ohio River. He was not allowed to farm the land or engage in any other activity thereon.

The lease drew its vitality, and indeed its very existence, from a permit issued by the Corps of Engineers. Plaintiff conceded he could not operate his tipple and conduct his sand and gravel business without the permit. His entire operation on tract 114 was completely dependent on the flow of the Ohio River to carry sand and gravel downstream to where it could be dredged from the riverbed in an area known as Scuffletown

Bar adjacent to tract 114, and processed by means of the tipple located on said tract. The Corps of Engineers had initially issued the permit in question, without any fee or cost attached thereto, in 1951 to Hageman Sand and Gravel Co. of Mt. Vernon, Indiana, and it was subsequently extended and/or reassigned until June 11, 1959, when it was assigned to Mid-West. Mid-West also had the permit extended, the last extension to expire on December 31, 1966.

The Corps of Engineers issued the permit, pursuant to the Rivers and Harbors Act of 1899, 33 U.S.C. § 401 et seq., and it allowed the holder to conduct sand and gravel dredging operations for commercial purposes on the Ohio River at the Scuffletown Bar. Attached to the permit was a drawing showing the proposed dredging operations. The drawing noted the "Proposed Location of Pump, Pipe Line, 3 Hopper For Storage and Screening" and schematically depicted the tipple on the riverbank and the 8-inch pipe leading from the dredge barge in the river to the tipple on the bank. The permit reserved the right of defendant to revoke it at any time in the interests of navigation and provided that no claim shall be made against defendant on account of revocation nor shall defendant incur any expenses as a result of revocation of the permit.

Plaintiff spent most of 1958 in preparation for the conduct of his sand and gravel business. He made considerable improvements to the tipple, *e. g.*, he added five additional hoppers or bins to the tipple in 1958, and in 1962 he made additional improvements to the tipple in order to increase production, *e. g.*, he added a gravel screw and installed a new-type pump. The record does not indicate the initial purchase price of the tipple, the costs of improvements thereto, nor any depreciation data bearing thereon.

Tract 114 was a triangular-shaped plot of land lying immediately east of an area known as tract 108 and immediately south of an area known as tract 110 along the right bank of the Ohio River

near Newburgh, Indiana. It consisted of 5.40 acres of which 3.47 acres were below normal pool (elevation 347.0 m. s. l.). Under his lease, plaintiff, as noted supra, was entitled to use a reasonable portion of tract 114 on the riverbank for his tipple. The tipple was located in the northwest corner of tract 114, quite close to the boundary lines of tract 108 on the west and tract 110 on the north. The evidence presented at trial was inconclusive as to the elevation of the ground on which the tipple was located, varying from a low of 355 m. s. l. to a high of 366.5 m. s. l.

The purpose of the tipple was to size and separate sand and gravel. Sand and gravel was dredged from the Ohio River and pumped through an 8-inch pipeline into the tipple where it was processed by means of conveyors, screens, vibrator, scrubbers and washers and separated into the various hoppers or bins as sand or gravel. Chutes located at the bottom of the hoppers permitted trucks beneath the hoppers to be loaded with the final product for delivery to storage bins for commercial sale. Dredging operations were conducted from a steel barge located out in the river anywhere from 100 to 125 feet from the water's edge. The pipe through which the dredged sand and gravel was pumped rested on pontoons from the barge until land was reached at which point it rested on supports until the pipe reached the tipple.

In December 1964, the tipple consisted of eight steel hoppers or bins and assorted electrical and other equipment necessary for its operation. The tipple sat on steel beam legs which were either embedded in concrete footings or bolted to steel plates embedded in concrete footings. The steel beam legs individually supported the various component parts of the tipple which were welded together to form a cohesive water-tight structure. The tipple itself was not designed to be a monolithic structure. Instead, elements were added and/or welded to the tipple as the need arose. The hoppers were from 8 to 12 feet off the ground in order to enable

trucks to be driven beneath them to be loaded. Two hoppers had concrete floors beneath them in order to better support the larger trucks. The tipple, as a structure, was around 85 feet long and averaged about 14 feet in width. The tops of some parts of the tipple were from 25 to 30 feet from the ground. The tipple was constructed so as to be a sturdy and long-lasting structure and was welded and braced together so as to withstand the pressures of high water, logs and driftwood which came downstream during the winter months.

The tipple operation was shut down during the winter months because of high water and/or ice conditions. Generally, tipple operations ceased in November and started up again the following May. Plaintiff discontinued tipple operations in mid-December 1964 because of adverse weather conditions. Plaintiff's tipple operation production increased over the years from a low of 2,243 tons of sand and gravel in 1958 to a high of 113,616 tons in 1964. The record indicates that the tipple's 1964 operations were profitable.

Like most tipples, plaintiff's tipple had the capability of being moved if market or other conditions so dictated. In sand and gravel, coal, and quarry operations, tipples similar to plaintiff's were frequently moved from one location to another.

On March 29, 1965, the Secretary of the Army revoked plaintiff's permit to conduct sand and gravel dredging operations in the Ohio River because of construction of the Newburgh Locks and Dam, a project to improve navigation on the Ohio River. Plaintiff was directed to remove from the Ohio River the equipment used in his dredging operations not later than July 1, 1965. It is conceded that revocation of the permit was accomplished in a legal and authorized manner. Following revocation of the permit on March 29, 1965, plaintiff's sand and gravel business on tract 114 was effectively terminated. Revocation of the permit rendered plaintiff's tipple useless as long as it remained on tract 114. Further, revocation of the permit frustrated the sole purpose of the lease of November 23, 1957, under which plaintiff conducted his sand and gravel operations. Under the terms of the lease, set out, *supra,* "failure to pump sand and gravel for a continuous period of six (6) months or more shall constitute an abandonment and termination of this lease * * *." Since plaintiff stopped pumping in mid-December 1964, revocation of the permit on March 29, 1965, leads, on this record, to the reasonable conclusion that by June 25, 1965, the lease was considered abandoned and terminated by the parties thereto. There is no evidence in the record that any rent or royalty was paid by plaintiff to the lessors for 1965 or any part thereof, or for any year thereafter as required by said lease.

Subsequent to March 29, 1965, plaintiff made no effort to remove his tipple from tract 114. The record clearly establishes that plaintiff voluntarily chose not to move his tipple because he believed it would not be worthwhile, costwise, to do so. The tipple was considered an "eye sore" on the riverbank by the Corps of Engineers in August 1967, because of its deteriorated condition, and its removal was subsequently effected by the Corps by means of competitive bidding. The Corps reasonably concluded, in this regard, that the tipple had been abandoned on the riverbank.

The land on which the tipple was located (tract 114), as well as surrounding lands (*e. g.,* tracts 108, 110), were considered necessary by the Corps of Engineers for enhancing navigation and commerce along the Ohio River, a navigable river, in connection with the construction of the Newburgh Locks and Dam. Defendant, attendant to this project, condemned, informal proceedings, on June 25, 1965, tracts 108 and 110 *inter alia,* and appropriate compensation was subsequently awarded to all parties affected thereby. Tract 114 was included by the Corps of Engineers in the land area which was felt to be necessary in connection with the above-mentioned nav-

igational project, but the Corps of Engineers concluded that this tract was below the ordinary high-water line (OHWL) (which it determined to be 362.6 m. s. l. for this area) and thus belonged to the Federal Government under the doctrine of navigational servitude.[1] The Corps of Engineers' OHWL determination was based on a 1960 survey of the Ohio River from Louisville, Kentucky, downstream to near the mouth of said river at Cairo, Illinois. The survey area encompassed tract 114. Accordingly, defendant believed it was not necessary to include this tract in the formal condemnation proceedings since the land already belonged to the government. In any event, it is clear defendant intended to exercise ownership and possession over tract 114, the only tract germane to this case, whether by formal condemnation proceedings or otherwise.

Plaintiff contends that the tipple site on tract 114 was above the ordinary high-water mark [2] and thus defendant by inverse condemnation [3] took said land, as well as his leasehold interest thereon, at or about the time it formally condemned tracts 108 and 110 on June 25, 1965.[4] Since the tipple, in plaintiff's view was attached to the land and a part thereof, it was also taken by defendant.[5] Thus, the first issue as framed by plaintiff is whether or not the tipple was part of the realty on or about June 25, 1965. If the tipple is personalty, then plaintiff ostensibly would agree that he is not entitled to recover the value thereof. The second issue to be decided is whether plaintiff's leasehold on or about June 25, 1965, constituted a compensable interest.

I.

■■ Plaintiff claims that because the sand and gravel tipple was annexed to the land it must be considered real property.[6] There is no question but that the tipple may properly be considered a trade fixture.[7] The general rule at common law considered anything annexed to the realty a part thereof. In essence, plaintiff relies on this simple

1. See United States v. Kansas City Ins. Co., 339 U.S. 799, 804–808, 70 S.Ct. 885, 94 L. Ed. 1277 (1950).

2. The parties at trial and in their briefs devoted much attention to the question of whether the tipple site was above or below the ordinary high-water mark. It is a most troublesome question and the record in this case does not provide that degree of positive evidence on which one could resolve the question with complete assurance that a correct decision had been reached. Fortunately, the case can be disposed of on other grounds. It is conceded that defendant possessed tract 114, including the tipple site, on and after June 25, 1965. It is not necessary to determine whether that possession was obtained by inverse condemnation or navigational servitude, since plaintiff would not be entitled to recover in any event.

3. Wilfong Poultry Farms v. United States, 480 F.2d 1326–1327, 202 Ct.Cl. 616, 619, n. 2 (1973), defined inverse condemnation as "a legal label for effective expropriation of private property, the sovereign acting indirectly without benefit of formal eminent domain proceedings in condemnation; thus, sovereign acts incompatible with an owner's present enjoyment of his property rights."

4. It is interesting to note that as far as is known no taking claim has been advanced by the owners of tract 114, Marion D and Lillian Vanada.

5. There is no evidence defendant intended to take the tipple on June 25, 1965, or at any reasonable period of time thereafter and no act of the defendant has been cited or is present in this record from which one could imply or reasonably infer such intent. Absent such an intent, there can be no taking. J. J. Henry Co. v. United States, 411 F.2d 1246, 1249, 188 Ct.Cl. 39, 46 (1969); Biggs Rental Co. v. United States, 353 F.2d 1013, 1017, 173 Ct.Cl. 789, 796 (1965), cert. denied, 384 U.S. 927, 86 S.Ct. 1443, 16 L.Ed.2d 531 (1966).

6. If this is so then plaintiff as a lessee may not be the proper party entitled to direct compensation. The lessor, not a party herein, may have greater rights under the circumstances. See, e. g., The City of New York v. Cypress Ave. Holding Corp., 249 App.Div. 579, 293 N.Y.S. 223 (1st Dept.), aff'd mem., 274 N.Y. 581, 10 N.E.2d 561 (1937).

7. An item is generally regarded as a trade fixture if annexed to realty for the purpose of aiding one in possession thereof, especially a lessee, in the conduct of a business for profit. Bank of Shelbyville v. Hartford, 268 Ky. 135, 104 S.W.2d 217, 218–219 (1937).

rule,[8] claiming that the tipple was a large steel structure welded together and placed upon steel legs which were set in and/or welded to concrete footings and not readily movable.

■ ■ The common law rule, *supra*, was not without exceptions. One exception, almost equal to the rule itself, concerned trade fixtures annexed to realty by a lessee. Under this exception, based on principles of public policy and a desire to encourage trade and manufacturing, a trade fixture annexed to realty and belonging to a lessee is generally regarded as personalty. Van Ness v. Pacard, 27 U.S. (2 Pet.) 137, 143, 7 L.Ed. 374 (1829); Anderson-Tully v. United States, 189 F.2d 192, 196 (5th Cir. 1951); *see also* New Castle Theater Co. v. Ward, 57 Ind.App. 473, 104 N.E. 526, 528 (1914); Gordon v. Miller, 28 Ind. App. 612, 615–618, 63 N.E. 774, 776 (1902). In Wiggins Ferry Co. v. O & M Ry., 142 U.S. 396, 416, 12 S.Ct. 188, 194, 35 L.Ed. 1055 (1892), the Supreme Court in holding a trade fixture annexed to realty by a lessee to be personalty observed: " * * * Indeed, it is difficult to conceive that any fixture, however solid, permanent and closely attached to the realty, placed there for the mere purposes of trade, may not be removed at the end of the term * * *."[9] Under his lease, plaintiff unquestionably could move his tipple at its termination. Without more the tipple as a trade fixture belonging to plaintiff, a lessee must reasonably be considered personalty unless other facts compel a contrary conclusion. The record does not reveal any such facts. Plaintiff recognizes the impact of the trade fixture exception, *supra*, but counters with the argument that the tipple is more akin to mining machinery and equipment and some courts have "presumed" such machinery and equipment to be realty fixtures. Plaintiff cites 35 Am.Jur.2d, Fixtures, Sec. 108 and Strong v. Sunset Copper Co., 9 Wash.2d 214, 114 P.2d 526 (1941) in support of his argument. These authorities do not aid plaintiff for the critical reason that he is a lessee and not the owner of the realty. Indeed, the *Strong* case points out that where a tenant annexes a trade fixture to the realty, "the presumption is that he did not intend to enrich the free hold * * *." and thus the fixture would be treated as personalty whether mining machinery and equipment or not (114 P.2d at 533).

■ While a trade fixture is most often considered personalty, the intention of the party annexing the fixture to have it so treated might be found to be otherwise. Intention, in this regard, is to be gleaned from the totality of the circumstances, *e. g.*, the relationship of the parties, the nature and purpose of the item annexed, and the method of annexation. *See* Annot., 77 A.L.R. 1400 (1932). Plaintiff recognizes that one of the criteria used by courts in determining whether a fixture is realty or personalty is the "intention of the party making the annexation to make the article a permanent accession to the freehold." Binkley v. Forkner, 117 Ind. 176, 19 N.E. 753, 754 (1889).

8. Generally, whether a fixture is deemed realty or personalty turns on the circumstances of each case with certain criteria utilized by courts to assist them in reaching a determination. *See* 36A C.J.S. Fixtures § 1, pp. 590–592 and § 38—Trade Fixtures, pp. 691–694; *see also* Annot., 90 A.L.R. 159 (1934) (fixtures annexed by owner of realty), and Annot., 3 A.L.R.2d 286 (1949) (fixtures annexed by lessee) relative to eminent domain proceedings. The trend of modern decisions generally favors the more liberal construction of holding fixtures to be personalty. *See* 36A C.J.S. Fixtures, supra at 592–593.

9. Interestingly, the Supreme Court in this case cited with approval a lower court holding that stone piers built by a lessee railroad and firmly embedded in earth were personalty and did not become part of the realty. Accordingly, the fact that the steel legs which supported the tipple were embedded in or bolted to concrete footings is not a sufficient reason, under the circumstances, to treat the tipple as realty. *See* McFarlane v. Foley, 27 Ind.App. 484, 486, 60 N.E. 357, 358 (1901); *see also* Block v. Talge, 221 Ind. 658, 661, 51 N.E.2d 81, 82 (1943).

■ There is no affirmative evidence that plaintiff intended the tipple to be part of the realty. The evidence that is available shows rather clearly that the tipple was considered personalty by plaintiff. First plaintiff's relationship with the owner of the realty was that of lessee. The lease under which plaintiff conducted his business operations, which centered on the tipple, clearly contemplated the right of removal of the tipple at its termination. While the lease was for a period of 20 years with an option to renew for an additional period of 5 years, provisions in the lease also made it subject to termination within a 6-month period if certain conditions existed. The termination provisions of the lease are not consonant with the view that the tipple was deemed part of the realty. *See* United States v. Certain Parcels of Land, 131 F.Supp. 65, 70–71 (S.D.Cal. 1955). Too, plaintiff made expensive improvements to the tipple to increase its production and efficiency of operation. It is not reasonable to conclude that these improvements, expecially in view of the termination provision of the lease, were made for the benefit of the lessor, which would be the case if the tipple were considered part of the realty. Bank of Shelbyville v. Hartford, *supra*, 104 S.W.2d at 219. *See* Wiggins Ferry Co. v. O & M Ry., *supra*, 142 U.S. at 415. *See also* Central Trust & Savings Co. v. Wallace, 66 Ind.App. 629, 634, 118 N.E. 593, 594 (1918). Second, the tipple was designed to function as a trade device and was dependent on this particular river site to provide it with the raw materials, sand and gravel, necessary to sustain its operation. If the raw material source was closed off at this river site, for any reason, the tipple could not operate and the purpose for its existence on the site would cease. Under these circumstances, the tipple would have to move to another site if it were to continue operations.[10] Indeed, the tipple had been moved to the site in question from another location. The fact that the tipple only consisted of three hoppers at the time of said move is not deemed important. It was capable of being moved whether it consisted of three hoppers or eight hoppers. Third, the tipple sat on steel legs which were embedded and/or bolted to steel plates embedded in concrete footings. The tipple was readily removable by experienced personnel by backing a low-boy truck under the bins, which were easily severed from the steel legs and into sections by torch cutting, and removing them by sections.[11] The record indicates that tipples, such as the one in question, were frequently moved from one location to another for a variety of reasons. See in this regard Shaleen v. Central Coal & Coke Co., 127 Ark. 397, 192 S.W. 225, 227 (1917). Removal of the tipple did not damage the realty and would not damage the tipple itself which could be reassembled at a new site and operations reestablished. In fact, plaintiff did not want to remove the tipple because of the expense involved. However, it has been held that "inconvenience and expense of removing a going business and its equipment from property so taken cannot be paid for directly and cannot operate indirectly to change a chattel into real estate." Fu-

10. The lease, fairly construed, recognized the fact that operations might be terminated when it provided that the lease might be terminated if there were no operations for a 6-month period.

11. Removal of the tipple in sections does not affect its character as personalty. *See* Andrews v. Williams, 115 Colo. 478, 173 P.2d 882, 884 (1946). In Potomac Electric Power Co. v. United States, 66 App.D.C. 77, 85 F.2d 243, 248 (1936) cert. denied, 299 U.S. 565, 57 S.Ct. 27, 81 L.Ed. 416 (1936) three pieces of heavy machinery, one of which was a 35-ton generator set which rested on a concrete foundation specially built for it, were considered personalty since used in the business and not considered improvements to the real estate. Even ponderous and firmly attached items may retain their character as personalty if such is the intent of the parties, Nadien v. Bazata, 303 Mass. 496, 22 N.E.2d 1, 2 (1939). Accordingly, the size of tipple, which was used in a business and cannot under any view be considered an improvement to the real estate, does not affect its status as personalty under the facts of this case.

trovsky v. United States, 62 App.D.C. 235, 66 F.2d 215, 217 (1933). Finally, corroborative of the view that the tipple was personalty is the fact that industry custom and trade practice treated tipples, similar to the one in question, as personalty. *See* Van Ness v. Pacard, *supra*, 27 U.S. (2 Pet.) at 143, 144.

Plaintiff cites a number of cases wherein courts have held certain fixtures to be part of the realty. Each of these cases turned on their own facts and provide little guidance here.[12] For example, plaintiff relies on United States v. 252.36 Acres of Land, 336 F. Supp. 667, 671 (W.D.Penn., 1972) wherein the District Court issued an advance ruling which the court hoped would be useful to the parties in their trial preparations or settlement negotiations. The dispute in this case centered on whether certain undescribed sand and gravel processing machinery located on condemned land were part of the real estate under Pennsylvania's Assembled Economic Unit Doctrine. As is obvious, the case has limited application—involving as it did the application of Pennsylvania law to specific facts. More importantly, the ruling in the case does not delineate the articles and items which make up the sand and gravel processing machinery such that one could form a conclusion that a tipple, such as is in issue here, would be considered realty or personalty, absent consideration of the doctrine on which the ruling hinged. Assuming, *arguendo* viability of the District Court ruling to the facts in this case, a careful reading of that ruling is not incompatible with the conclusion reached here that the tipple should be treated as personalty. Under the Pennsylvania Assembled Economic Unit Doctrine, an owner is not to be compensated if the machinery, equipment and fixtures of the economic unit located on land condemned in Pennsylvania is susceptible of continuance as a comparable economic unit in a new location. In this case, the tipple, as an economic unit, was capable of being removed to another location and functioning as an economic unit at the new location and presumably would be considered personalty, on the facts of this case, under Pennsylvania law. (See 336 F.Supp. at 671.)

 Plaintiff could have moved his tipple at any time after the permit was revoked. Plaintiff decided that movement of the tipple to another location would be too expensive. In United States v. Sixty-Two Parcels of Land, 24 F.Supp. 882 (D.Del.1938) a claim that the government took cottages of lessees when it condemned certain land was rejected when the lessees failed to remove said cottages within an 18-month period although free to no so during this period. The fact that one of the lessees had no money to effect removal of the cottages did not support a taking claim or a right to compensation for the cottages. Here, plaintiff's economic decision not to move the tipple likewise provides no basis for compensation. Plaintiff made no effort to sell the tipple for salvage[13] or

---

12. Only one case cited by plaintiff in his initial brief involves a lessee, Pause v. Atlanta, 98 Ga. 92, 26 S.E. 489 (1896) and it concerned primarily the right of a lessee operating a restaurant to recover damages to a leasehold interest inflicted by a municipality. There was no discussion of whether fixtures were to be treated as realty or personalty. Apropos the *Pause* case, *see* Matz v. Miami Club Restaurant, 127 S.W.2d 738 (Mo.1939) wherein restaurant items (bar, booths, soda fountain, etc.) were considered trade fixtures under a lease and thus personalty. The annotation relied on by plaintiff (90 A. L.R. 159–62) has little application to the taking of a leasehold interest. A more pertinent annotation, as far as this case is concerned, is Annot., 3 A.L.R.2d 286, et seq., which deals with the question of the rights of lessees to recover for loss of fixtures and leasehold interests in eminent domain situations.

13. When the tipple was removed in 1969, it cost the successful bidder about $2,000 to move it. In order to remove it from the riverbank, the Corps of Engineers made it part of a package deal in a bid invitation involving removal of other items located on previously condemned lands. The successful bid was $450. The successful bidder allocated $275 to the tipple, and subsequently, at a salvage sale, realized $3,700 from sale of six of the tipple's bins.

otherwise. He simply walked away from the tipple. In United States v. 252.36 Acres of Land, *supra*, the case relied on by plaintiff and discussed, *supra*, the District Court made clear it would not condone, by way of compensation, an owner "walking away from his machinery" 336 F.Supp. at 670, 671. During the period prior to August 1967, the tipple was cannibalized, *i. e.*, stripped, of all motors, switch gears, electrical wiring, etc. The record does not indicate who did the stripping, but by August 1967 it was reasonably concluded by the Corps of Engineers that the tipple, in view of· its condition and the condition of the site around the tipple,[14] had been abandoned on the riverbank.

■ Under the circumstances of this case, it seems reasonable to conclude, as did the Corps of Engineers, that plaintiff abandoned the tipple on the riverbank. Plaintiff had no intention of removing the tipple and its deteriorated condition in 1967, having been inoperative and uncared for since at least late 1965, with its vital parts removed therefrom, bespeaks intent by the owner (plaintiff) to abandon it and leave removal and attendant expense of the carcass to someone else. Intent to abandon property may be inferred from the facts of a case, Baglin v. Cusenier Co., 221 U. S. 580, 597–598, 31 S.Ct. 669, 55 L.Ed. 863 (1911). Such an inference is warranted herein, based on plaintiff's refusal to remove the tipple and his allowing it to deteriorate to an "eye sore" on the riverbank. Indeed, it has been held that if a lessee does not remove fixtures at the termination of his lease, he is presumed to have abandoned them. Hedderich v. Smith, 103 Ind. 203, 2 N.E. 315, 316 (1885); Glaser v. North's, 201 Or. 118, 266 P.2d 680, 682 (1954). With the revocation of the operating permit in March 1965, the purpose of the lease was frustrated and it is reasonable to conclude it was considered terminated by the parties thereto. There certainly was no intent, as indicated earlier, on the part of the Corps of Engineers to take the tipple. Plaintiff made no effort to remove the tipple and the record contains no evidence that any government act, directly or by reasonable inference, prevented plaintiff from removing the tipple. The circumstances indicate an intent by plaintiff to abandon the tipple, *cf*. Biggs Rental Co. v. United States, 353 F.2d 1013, 1017, 173 Ct.Cl. 789, 796–797 (1965) cert. denied 384 U.S. 927, 86 S.Ct. 1443, 16 L.Ed.2d 531 (1966). Since the government had the tipple removed after it had been abandoned by plaintiff, he is not entitled, in any event, to recover the value thereof.

II.

It is established that a leasehold interest is property, the taking of which entitles the leaseholder to just compensation for the value thereof. Pewee Coal Co. v. United States, 161 F.Supp. 952, 955, 142 Ct.Cl. 796, 801 (1958), cert. denied, 359 U.S. 912, 79 S.Ct. 588, 3 L.Ed.2d 574 (1959). As was the case with respect to the tipple claim, it is not necessary to determine the question of whether plaintiff's leasehold interest involved land above the ordinary high-water mark because no recovery would be due plaintiff in any event.

■ Generally, the measure of a lessee's compensation for the taking of his leasehold interest in eminent domain situations is the fair market value of the unexpired term of the lease less the rent which the lessee would have to pay. United States v. Petty Motor Co., 327 U.S. 372, 381, 66 S.Ct. 596, 90 L.Ed. 729 (1946); R. S. Howard Co. v. United States, 81 Ct.Cl. 646, 654 (1935); United States v. 70.39 Acres of Land, 164 F. Supp. 451, 473 (S.D.Calif.1958); see Annot., 3 A.L.R.2d 286, 290–96 (1949). In this case, the sole purpose of plain-

---

14. The tipple had been sitting idle since December 1964. Over several feet of silt had accumulated around and beneath the tipple such that one would have to stoop quite low to walk underneath the tipple whereas in December 1964, trucks were driven underneath the tipple to be loaded from the bins.

tiff's lease was to enable him to conduct his sand and gravel business on the bank of the Ohio River. When the Corps of Engineers revoked the permit to engage in this business on the river, the purpose and vitality of the lease was frustrated and impaired. The record indicates quite clearly that after revocation of the permit on March 29, 1965, the lease had no significant market value to plaintiff or to anyone else.[15] Under the lease, plaintiff paid the lessor some $2,000 per annum as rent. Over the unexpired term of the lease the rent obligated would amount to some $24,000. Plaintiff set the value of his leasehold interest at $15,000. Accordingly, after revocation of the permit, the rent obligation under the lease exceeded any possible market value of the lease and thus plaintiff would not be entitled to recover, in any event, for its leasehold interest subsequent to government possession of the land in question on and after June 1965. Corrigan v. Chicago, 144 Ill. 537, 33 N.E. 746, 749 (1893); see 4 Nichols, Eminent Domain, § 12.42 [3], at 516 (3d 1971); see also Annot., 3 A.L. R.2d 293–94. It is plaintiff's burden to show that the value of his leasehold interest is more than the amount of his rent obligation, United States v. 6.87 Acres of Land, 147 F.2d 351, 353 (2d Cir. 1945). Plaintiff is in exactly the same position he would have been in had the government not taken possession of tract 114, which encompassed the leased land, and thus no basis exists on which plaintiff can recover for the value of its leasehold interest. Almota Farmers Elevator & Whse. Co. v. United States, 409 U.S. 470, 474, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973) and cases cited therein. See also United States v. General Motors Corp., 323 U.S. 373, 379, 65 S.Ct. 357, 89 L.Ed. 311 (1945).

Under the lease, the parties could terminate the lease when there was no production by the tipple for a 6-month period. The tipple shut down in December 1964. On March 29, 1965, the permit to conduct sand and gravel operations was revoked. On June 25, 1965, formal condemnation proceedings were instituted relative to tracts 108, 110 and 111 and the government exercised possession over tract 114. Accordingly, on June 25, 1965, the tipple had been inoperative for 6 months. While there is no affirmative evidence that the lease was formally terminated, the circumstances in the record raises a presumption that the parties to the lease so viewed the situation. There is no evidence that plaintiff paid any rent for the year 1965 and the absence of such a payment supports an inference that no such rent payment was due because no lease agreement existed. Generally, when leased land is taken, the lessee's obligation to pay rent is discharged. See 4 Nichols, Eminent Domain, § 12.42 [1], at 492. Thus, plaintiff here incurred no damages in the way of continued rental payment obligation. If no lease agreement existed on or before June 25, 1965, then there was no leasehold interest in existence which could be the subject of a taking.[16]

15. It has been suggested that a lease is often viewed as within that class of property not commonly bought and sold and consequently the value to the owner might be taken as the best and only available test of market value. See Polasky, The Condemnation of Leasehold Interests, 48 Va.L.Rev. 477, 519 (1962); see also Kimball Laundry Co. v. United States, 338 U.S. 1, 6, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949). As was indicated, the revocation of the permit rendered the special purpose lease valueless as far as plaintiff was concerned.

16. Plaintiff would not be entitled to recover the estimated cost of installing a new tipple at another location even if a taking were found to have taken place since such costs would constitute consequential damages and, as such, would not be compensable as part of just compensation. Kimball Laundry Co. v. United States, 338 U.S. 1, 11–12, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949); United States v. General Motors Corp., 323 U.S. 373, 379, 65 S.Ct. 357, 89 L.Ed. 311 (1945). Even if this were not so, reproduction costs would not be an appropriate valuation method in this case where another valuation basis was available. Schoeffel v. United States, 193 Ct.Cl. 923, 936 (1971); Bishop v. United States, 164 Ct.Cl. 717, 723 (1964).

### III.

Still another reason serves to preclude recovery by plaintiff for the value of the tipple and the leasehold interest. The permit to dredge and remove sand and gravel from the Ohio River created the value in the leasehold and the tipple which plaintiff now seeks to recover. It is established that one is not entitled to recover elements of value that the government created or that it might have destroyed under exercise of government authority other than power of eminent domain, United States v. Fuller, 409 U.S. 488, 491–492, 494, 93 S. Ct. 801, 35 L.Ed.2d 16 (1973). There is no question but that defendant had a paramount right to revoke the permit with complete immunity from damage claims resulting therefrom, United States v. Chandler-Dunbar Co., 229 U.S. 53, 68, 33 S.Ct. 667, 57 L.Ed. 1063 (1913); Miami Beach Jockey Club v. Dern, 66 App.D.C. 254, 86 F.2d 135 (1936), cert. denied, 299 U.S. 556, 57 S. Ct. 17, 81 L.Ed. 409; *see also* Schoeffel v. United States, 193 Ct.Cl. 923, 936 (1971). When plaintiff's permit to remove sand and gravel from the Ohio River was revoked by the Corps of Engineers, his business operations ceased. With this revocation, the tipple's purpose at the site was at an end and plaintiff had to decide whether to move the tipple to another location, sell the tipple for salvage or otherwise, or abandon the tipple where it was. Accordingly, it was not defendant's possession of the land that rendered the tipple useless, but defendant's absolute right to revoke the permit that enabled the tipple to process sand and gravel removed from the river. Damages that are not the consequence of a taking cannot be recovered. In Kelley's Creek & N. W. R. v. United States, 100 Ct.Cl. 396, 406 (1944) the court denied recovery for a coal tipple which had been rendered useless not by the taking of the land but because the level of the water had been raised by construction of a dam on a navigable stream. Plaintiff has stressed the fact that the tipple itself did not interfere with navigation on the Ohio River since it sat on the riverbank. However, the court in the Kelley's Creek case pointed out that the absence of physical interference with navigation was not a significant fact (100 Ct.Cl. at 410). It must be concluded that there was no compensable taking of plaintiff's property by defendant.

### CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is dismissed.